**FORD MOTOR COMPANY, Appellant,**

v.

**Robert GONZALEZ, Jr. and Nora Navin, Appellees.**

No. 04–98–00826–CV.

Court of Appeals of Texas, San Antonio.

Oct. 20, 1999.

Rehearing Overruled Nov. 30, 1999.

Jaime A. Saenz, Alison Kennamer, Rodriguez, Colvin & Chaney, L.L.P., Brownsville, Michael W. Eady, William L. Mennucci, Brown McCarroll & Oaks Hartline, L.L.P., Austin, for Appellant.

Richard B. Stone, Stone & Stone, William R. Edwards, III, John Blaise Gsanger, Edwards Law Firm, L.L.P., Corpus Christi, for Appellee.

Sitting: PHIL HARDBERGER, Chief Justice TOM RICKHOFF, Justice ALMA L. LÓPEZ, Justice.

## OPINION

Opinion by: ALMA L. LÓPEZ, Justice.

This is a products liability case stemming from a single car accident in Jim Wells County. Ford Motor challenges the legal and factual sufficiency of the evidence of causation supporting a jury verdict in favor of plaintiffs' claims of manufacturing defect, marketing defect, negligence, and deceptive trade practices concerning a 1989 Ford Escort. We find sufficient evidence of a causal link and affirm the judgment of the trial court.

### Factual Background

Robert Gonzalez, Jr. purchased a new Ford Escort from the Ford dealership in Alice, Texas, in 1989, and over the next several months noticed excessive wear on the outer part of the right front tire. None of the other three tires on the vehicle exhibited unusual or uneven wear. Gonzalez returned to the dealer to have the car's front end checked. On this first of many such attempts to address the problem, Ford dealership mechanic, Frank Ruiz, checked the camber,[1] caster,[2] and toe-in[3] measurements on the front-end wheel alignment and found a misalignment of the right front wheel. Ruiz adjusted the alignment by turning the tie rod ends to adjust the toe-in. The adjustment held for a time; however, when Gonzalez noticed that his right front tire was, again, showing uneven, outer-edge wear, he returned to the dealership several more times. He ultimately discussed the prob-

---

1. Camber is the inward or outward tilt of the wheel at the top as viewed from the front of the vehicle. Inward tilt is referred to as negative camber, outward tilt is referred to as positive camber. These settings are permanently set at the factory.

2. Caster is the forward or rearward tilt of the support arm of the wheel as viewed from the side of the vehicle. These settings are permanently set at the factory.

3. Toe is the comparison of horizontal lines through both wheels of the same axle as viewed from above the axle. Toe-in refers to the wheel setting that is directed "in" or toward the engine, toe-out describes a setting directed "out" or away from the engine.

lem on four separate occasions with factory representatives and was reassured that "the problem would be corrected."

When the realignment did not hold, Ruiz next noted that the ball joint tie rod ends were worn and loose.[4] He replaced them, reset the toe-in, and rotated the tires. When the uneven wear on the right front tire reoccurred, Gonzalez took the car to Sears Automotive Center for another realignment. The uneven wear problem continued. Gonzalez returned to the Ford dealership where Ruiz again adjusted the toe-in. Gonzalez brought his Escort in for such service between ten and fifteen times during the two years he owned the car.

Gonzalez used this car to drive to and from his work as a derrick hand for Blocker Drilling. On April 15, 1991, he had completed a 12–hour shift at a drilling site near Pearsall and slept for several hours before driving to his home in Alice, Texas. Traveling with him were his fiancé, plaintiff Nora Navin, and her son, Jordan. They were all wearing seatbelts. As they neared Alice, Gonzalez and Navin were conversing in the front seat, and Jordan was eating a snack in the back seat. Driving southward on Highway 281 at approximately 58 miles per hour,[5] Gonzalez testified that the steering wheel suddenly jerked violently in his hands, the Escort swerved to the right, onto the shoulder, then as he steered back onto the pavement, it rolled over five times.[6]

The accident was witnessed by Sam Rodriguez, who was driving in the opposite direction in the northbound lane. Rodriguez noticed the Escort approaching in a normal manner, then the right front wheel wobbled and leaned to the right. The left front tire was straight, but the right front tire was leaning in the two o'clock position. He could see Gonzalez fight with the steering wheel as the car approached the shoulder. When the car returned to the pavement, it rolled over. Rodriguez reported to the investigating officer, Trooper Caro, that a visible problem with the right front wheel occurred before Gonzalez lost control of the Escort. The trooper testified that Rodriguez's eye-witness account was consistent with his investigation of the tire tracks, gouge marks, and other evidence at the crash site. Appellees' expert, James Flanagan, M.E., agreed. Trooper Caro also testified that the tire marks on the roadway left by the right tires indicated to him that these tires were "at least upright enough" to be leaving tire marks. He thought they might be "yaw marks," indicating that the right front wheel was sliding sideways but still spinning when the car returned to the pavement after going off the shoulder, but he wasn't sure.

The Escort was unavailable for inspection by either party. The jury viewed photographs of the right front wheel and the suspension assembly taken after the accident which show that the right front MacPherson strut[7] was disconnected from the wheel assembly.

Ford's mechanical engineering expert, Frederick Dahnke, stated that the repairs

---

**4.** Ruiz testified that this wear is not unusual for a car approaching 20,000 miles and is generally the result of driving on unpaved, bumpy roads. Plaintiff's mechanical engineering expert, Flanagan, however, stated that it was more likely that one would not encounter this problem before 50,000 miles unless something was hammering on them as a result of a misalignment.

**5.** Gonzalez maintains he was traveling at 58 miles an hour and was not in a hurry, and the only eyewitness, Sam Rodriguez, confirms that he was not speeding. However, Ford's accident reconstruction expert, Dr. Jose Martinez, calculated that the Escort was traveling approximately 70 miles per hour, based on calculations from tire marks and roll marks.

**6.** Gonzalez and Navin suffered physical injuries which required surgery, and Gonzalez sustained permanent weakness and numbness in his right arm. Ford does not dispute the damage awards.

**7.** The MacPherson strut is the mechanism that holds the front end of the vehicle up. It is connected to the wheel assembly through the steering knuckle, and stands in a roughly vertical position bolted to the Escort's body.

performed by the dealership were appropriate responses to the complaints Gonzalez brought and that in his opinion the repairs had corrected the problem each time. He also stated that he would expect the right front tire to show wear first because it receives the power of acceleration first. Another contributing factor to right front tire wear is the fact that the passenger seat is often unoccupied, causing the wheel with the lighter load to want to spin faster. The right front tire at the time of the accident did not show unusual wear; however, Gonzalez testified that he had to frequently rotate and replace his tires because of the misalignment problem. He also stated that he would not have purchased the car had he been told to expect right front tire wear to this degree.

Ford's accident reconstructionist, Dr. Martinez, testified that the cause of the accident actually lay with Gonzalez. Calculating that Gonzalez was traveling approximately 70 miles per hour, he made a sharp steer to the right causing the Escort to go off the road, and then a sharp left steer to get back on the pavement which ultimately sent him into the roll.

The jury found Ford Motor Company liable for manufacturing defect, marketing defect, negligence, and violations of the DTPA. Comparative negligence findings were assessed at 80% liability to Ford Motor and 20% against Gonzalez. Based on this verdict, the trial court entered judgment in favor of Navin for $249,000.00 and in favor of Gonzalez for $361,400 plus pre- and post judgment interest. This appeal followed.

## Legal Sufficiency

Ford Motor's first issue complains there is no evidence that any defect in the Ford Escort or that Ford Motor, itself, caused the plaintiffs' accident. To review a no-evidence challenge to the verdict, we must consider all of the record evidence in the light most favorable to the party in whose favor the verdict has been rendered, and indulge every reasonable inference deducible from the evidence in that party's favor. *See Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998); *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998). Under this standard our scope of review extends to all the evidence. *Id.* Where there is any evidence of probative force to support the finding, we must overrule the challenge and uphold the finding. *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997).

Ford Motor asserts that the pivotal issue is whether the right front wheel disconnected as a result of the accident, or whether it occurred before and caused the accident. Ford Motor argues that the jury, having heard evidence of abnormal tire wear, drew an unsupported causal connection between tire wear and the strut coming out of the steering knuckle. Ford Motor asserts that there is no evidence that anything was wrong with the tire alignment or suspension camber or caster. To make this argument, however, Ford Motor ignores testimony supplied by the appellees' witnesses. While the jury did hear testimony that when the Escort returned to the pavement after veering on the shoulder, its right tires were still upright, it also heard Rodriguez state that the right front tire was leaning in the two o'clock position before the car left the pavement the first time. They also heard Trooper Caro opine that the tire marks made once the car returned to the pavement, although "upright," were in a sliding, spinning or yaw pattern. Flanagan testified that the relatively undamaged condition of the strut proved that the wheel came loose before the crash. Had the wheel torn off during the crash, as Ford suggests, he would have expected to see more damage to the strut.

The thrust of Ford Motor's argument is that appellees' expert witnesses did not offer sufficient explanation of the mechanical relation between the strut and wheel alignment, camber and caster, and off-road

tire marks to support a causal connection between misalignment and the resulting accident. Ford claims that the only evidence of this relation is Flanagan's "bare" expert opinion that "the wheel came off, came loose from the strut." Ford points out that Rodriguez, the eyewitness, offered no testimony as to *why* the wheel came loose, only that it leaned prior to the accident. Gonzalez and Navin testified about what they experienced inside the car. Only Flanagan attempts to link their testimony to a defect, and Ford attacks this effort as "totally deficient."

■ Naked expert opinion unsupported by fact can be said to have a "suspension problem" of its own because it carries no probative force in law. *See Bass v. General Motors Corp.*, 491 S.W.2d 941, 945 (Tex.Civ.App.-Corpus Christi 1973, writ ref'd n.r.e.). However, as our sister court in Texarkana has noted, direct proof of a defect is not required.

> Strict liability does not require a specific showing of how the product became defective. *McDevitt v. Standard Oil Co.*, 391 F.2d 364 (5th Cir.1968). In a classic case in which a consumer found a putrefied big toe in a plug of chewing tobacco, the consumer was not required to prove how the big toe got there or whose toe it was. *Pillars v. R.J. Reynolds Tobacco Co.*, 117 Miss. 490, 78 So. 365 (1918), cited in *Lartigue v. R.J. Reynolds Tobacco Co.*, 317 F.2d 19, 34 (5th Cir.1963). That is the nature of products liability. This rule evolved because a consumer is not in a position to know the manufacturing process and how the defect might have occurred. *See McDevitt*, 391 F.2d 364. Thus, an ordinary product user is in no position to come forward with evidence pinpointing the act of negligence responsible for the user's injuries. *See id.* The consumer ordinarily is ignorant of both the product's intricacies and its maker's activity. *See* David P. Griffith,

*Products Liability—Negligence Presumed: An Evolution*, 67 TEX. L. REV. 851, 875 (1989). The rule that a consumer does not have to show specifically how a product became defective is also based on a consumer's right to receive a safe product from the manufacturer. One who sells a defective product is subject to liability for physical harm caused to the ultimate user, even if the seller exercised all possible care in the product's preparation or sale. *Gonzales v. Caterpillar Tractor Co.*, 571 S.W.2d 867 (Tex.1978). Courts presume a breach of a duty of due care as would be required in a negligence case; therefore, the injured party does not have to prove a breach. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 444 (Tex.1989).

If the plaintiff has no evidence of a specific design defect or manufacturing defect, he may offer evidence of the product's malfunction as circumstantial proof of the defect. *General Motors Corp. v. Hopkins*, 548 S.W.2d 344, 349–50 (Tex.1977). The testimony of a product's user or operator about the circumstances of the event complained of has been held sufficient to establish the product's alleged malfunction. *See Wernimont v. International Harvester Corp.*, 309 N.W.2d 137 (Iowa Ct.App. 1981); *Garrett v. Nobles*, 102 Idaho 369, 630 P.2d 656 (1981).

*Sipes v. General Motors Corp.*, 946 S.W.2d 143, 155 (Tex.App.-Texarkana 1997, writ denied).

In this case, there was no opportunity for experts to pour over the wrecked car before testifying. Flanagan, instead had to piece together for the jury the evidence that something was wrong with the car from the beginning.[8] Flanagan testified that the recurring problem of uneven wear on the outer edge of the Escort's right front tire was caused by a misalignment of the camber and castor, not by a misalign-

---

8. Flanagan based his decision on a review of the photos, the 1989 and 1990 repair records from the dealership, the eyewitness account, deposition testimony, and inspection of an exemplar vehicle.

ment of the toe-in. Both he and Ruiz testified that the Ford Escort's front-end suspension is designed so that the camber and castor are built-in at the factory—dealership readjustment is not intended.

Flanagan stated that the misalignment of camber and caster caused vibration in the ball joints which are bolted to the steering knuckle arm. He opined that this vibration from the factory-set misalignment damaged the ball joint by hammering the socket and ball. Such damage loosens the ball joint to the point that the wheel can be wobbled back and forth. He stated that this damage began when the Escort left the Ford factory and continued with the replacements until the day of the accident.[9] He further testified that when the Escort was returned to the dealership several times with alignment problems, the factory representative should have acknowledged that there was a problem with the suspension system, replaced the front end, and that would have prevented the accident.

Ford also argues that there is no evidence to support an inference that tire alignment or tire wear caused the right front MacPherson strut to pull free from the steering knuckle. The only evidence offered, says Ford, is that Gonzalez testified he met with Ford factory representatives at least four times, and they assured him the problem would be corrected. Ruiz testified he did realign the wheels each time. Ford says this does not prove that alignment caused the strut to separate from the knuckle, therefore it does not prove a defect caused the accident. Unusual tire wear, however, was not touted as the cause of the accident, rather it

evidenced a chronic symptom from which the jury could infer a defective suspension system.

Ford further argues that there is no evidence of proximate cause on the marketing defect and DTPA claims. Gonzalez testified he was never told that the right front tire was the dominant tire in the Escort and that it would wear faster that the other three, and that he would not have purchased the car had he known. Ford Motor asserts that this is insufficient to link excessive tire wear to the strut-knuckle separation. It is only relevant to a claim for new tires. The appellees submitted to the jury several independent theories of liability, *i.e.*, manufacturing defect, marketing defect, negligence, and three different definitions of deceptive conduct under their DTPA claim. If any one of these theories is supported by the evidence, the judgment may be affirmed. *Cf. Webb v. Lawson–Avila Constr., Inc.*, 911 S.W.2d 457, 462 (Tex.App.-San Antonio 1995, writ dism'd). On the basis of the evidence outlined in this opinion, we find that the jury heard sufficient evidence to reach its decision on liability on any one of these four theories of liability.

### FACTUAL SUFFICIENCY

Ford Motor claims that the evidence supporting the jury's findings of liability are so factually weak as to be clearly wrong. It asserts that the evidence can only support one conclusion: that the right front MacPherson strut broke free from the steering knuckle *during and as a result of* the roll of the vehicle, and not *before* the accident. The company bases

---

**9.** Such opinions concerning maladjusted camber and defective ball joints have withstood no-evidence challenges in other courts. *See, e.g., Wylie v. Ford Motor Co.*, 536 F.2d 306, 307–09 (10th Cir.1976) (reversing trial court's exclusion of expert testimony that Ford's defective ball joint caused crash when front wheel fell out of socket); *Moran v. Ford Motor Co.*, 476 F.2d 289, 290–91 (8th Cir.1973)(reversing directed verdict in light of expert opinion that defective right front wheel

ball joint separated and caused right front wheel to detach prior to crash); *Ford Motor Co. v. McDavid*, 259 F.2d 261, 262 (4th Cir. 1958) ("wear on the right front tire ... [on] the outer edge ... indicates maladjusted camber."); *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828–29 (Tex.1970)(reversing summary judgment in favor of car manufacturer where expert opined that ball joint came apart and caused front wheel to come loose before crash).

this conclusion on its own two experts who testified that the physical evidence did not support plaintiffs' theory. Ford discounts Rodriguez's eyewitness account of the tire leaning in the two o'clock position as only seeming to be so. This argument does nothing more than attack the credibility determinations that the jury made. The jury, however, could reasonably conclude that if Gonzalez experienced recurring problems with the right front tire and Rodriguez saw the right front wheel lean or bend in the two o'clock position before the Escort went off the pavement, that the separation between strut and knuckle occurred before the accident and caused the accident. The conflicting expert testimony was subject to a credibility call which the jury made.

Ford Motor Company's issues are overruled and the judgment of the trial court is affirmed.