THE GOODYEAR TIRE & RUBBER COMPANY, As Successor–in–Interest to the Kelly–Springfield Tire Company, Appellant

v.

Tina Louise RIOS, Individually, and on Behalf of All of the Heirs and the Estate of Raul Roy Rios, Jr.; and as Next Friend of Lisa Marie Rios, Victoria Nicole Rios and Cassandra Denay Rios, Minors; Raul Roy Rios, Sr.; and Roberto Guardian, Sr. d/b/a Guardian Quick Lube; Appellees.

No. 04–02–00574–CV.

Court of Appeals of Texas, San Antonio.

Feb. 25, 2004.

Rehearing Overruled May 4 and July 1, 2004.

Ruth G. Malinas, J. Michael Myers and G. Thomas Coghlan, David L. Hanna, Ball & Weed, P.C., San Antonio, for Appellant.

Thomas H. Crofts, Jr., Nissa M. Sanders, Christopher A. Lotz, Crofts & Callaway, P.C., San Antonio, Ronald L. Bair, Bair & Welscher, P.C., Houston, Mike A. Hatchell, Molly H. Hatchell, Hatchell PC, Tyler, Anthony Constant, Constant & Vela, Corpus Christi, Giancarlo Nisimblat, Nisimblat & Basart, P.L.L.C., Alice, TX, for Appellee.

Sitting: ALMA L. LÓPEZ, Chief Justice, SANDEE BRYAN MARION, Justice, PHYLIS J. SPEEDLIN, Justice.

## OPINION

Opinion by SANDEE BRYAN MARION, Justice.

This is an appeal from a jury verdict in favor of the appellees/plaintiffs. Plaintiffs sued appellant/defendant, The Goodyear Tire & Rubber Company ("Goodyear"), asserting that a tire manufactured by Goodyear in 1991 contained both a manufacturing defect and a marketing defect. On appeal, Goodyear raises numerous issues, including the sufficiency of the evidence in support of the jury's affirmative finding on plaintiffs' manufacturing and marketing defect claims. Because these issues are dispositive, and because we conclude the evidence in support of both claims is legally insufficient, we reverse and render judgment in Goodyear's favor.

## FACTUAL BACKGROUND

Raul Rios, Jr. worked as a contract gauger for Rolando Gonzalez. The Rios family used a 1994 Mazda pickup truck purchased by Gonzalez. Raul did not have a driver's license, so Gonzalez took Raul to various work sites during the week and Raul's wife, Tina, drove him in the truck to work sites on the weekends. Tina used the truck for her own purposes during the week. Gonzalez paid for truck repairs, replacement tires, and gas.

In February 2000, Gonzalez purchased four new Liberator tires for the truck at a Wal–Mart. On April 26, 2000, the left rear tire began leaking air from a puncture. Instead of returning the tire to Wal–Mart, Raul and his brother went to a Quick Lube. The Quick Lube is owned by Roberto Guardian, who works there with his sons. Raul did not have the tire fixed; instead, he purchased a used tire from Quick Lube as a replacement. The used tire was a Kelly Safari AWR manufactured by Goodyear in April 1991. No one at Quick Lube knew who had left the tire at Quick Lube or how long it had been there. The tire had been driven 35,000 to 40,000 miles, and had at least four punctures in the belt package, only one of which had been repaired. This repair was done using only a patch, and not a patch and a plug. The tire also had bead damage. It was undisputed that the punctures were not present when the tire was manufactured.

On April 29, 2000 at approximately 9:30 a.m., Tina drove Raul to work. At approximately 1:00 p.m., while Tina was driving, the left rear tire failed and the truck rolled over on Highway 16. Raul was ejected from the truck and died on May 27, 2000 from multiple organ failure. Tina sued Goodyear and Quick Lube. Raul's father, Raul Rios, Sr. ("Mr.Rios"), intervened as a plaintiff (Tina and Mr. Rios collectively the "plaintiffs").

There is no dispute that the tire failed because its tread and outer belt separated from the inner belt. The belts are made from brass-coated steel cords encased in a skim-stock rubber compound. These belts, along with the other tire components, are assembled into a "green tire," to which heat and pressure are applied in a process called "vulcanization." This process causes the components in the tire, including the skim stock, to chemically bond with each other. Plaintiffs contend that a manufacturing defect prevented the belts of the tire from properly bonding.

## PROCEDURAL BACKGROUND

The first trial commenced on November 5, 2001. Following jury selection, Goodyear objected to three of plaintiffs' witnesses because they had not been identified timely. Plaintiffs conceded the discovery violation and moved for a continuance, which the court granted. The first jury was discharged, and the second trial commenced on January 22, 2002.

The jury considered Tina and Mr. Rios's manufacturing defect claim against Goodyear, Mr. Rios's marketing claim against Goodyear, and a negligence claim against Quick Lube, Tina, and Raul. The jury found that the manufacturing and marketing defects were the producing cause of Raul's death, and no casual negligence on the part of Quick Lube, Tina, or Raul. The trial court rendered judgment against Goodyear on the $40 million verdict.

On November 5, 2003, this court granted an agreed motion filed by Goodyear and Tina to set aside the trial court's judgment in favor of Tina, without regard to the merits, and remand for entry of a settlement. However, because no settlement has been reached regarding the judgment in favor of Mr. Rios, Goodyear's complaint that the evidence is legally and factually insufficient to support the jury's finding that there was a manufacturing and marketing defect remains before this court.

## MANUFACTURING DEFECT

The parties agree that the issue is not whether the tire separated; instead, the issue is what caused the separation—a manufacturing defect or the wear and tear on the tire since its manufacture in 1991. All experts agreed that unrepaired or improperly repaired punctures, bead damage, and underinflated operation (all present here) can cause tread separation in a nondefective tire.

■■■ "Under Texas law, a plaintiff has a manufacturing defect claim when a finished product deviates, in terms of its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous." *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 434 (Tex.1997). Strict liability does not require a specific showing of how a product became defective. *Sipes v. General Motors Corp.*, 946 S.W.2d 143, 155 (Tex. App.-Texarkana 1997, writ denied). Thus, a plaintiff need not identify a specific engineering or structural cause of the defect. *Parsons v. Ford Motor Co.*, 85 S.W.3d 323, 330 (Tex.App.-Austin 2002, pet. denied). However, the plaintiff must trace the defect to the manufacturer. *Id.* Expert testimony is not necessarily required to establish a manufacturing defect. *See Sipes*, 946 S.W.2d at 155. Nor is direct evidence required to establish the existence of a defect, which often can be proven only by circumstantial evidence. *See Ford Motor Co. v. Gonzalez*, 9 S.W.3d 195, 199 (Tex. App.-San Antonio 1999, no pet.); *Sipes*, 946 S.W.2d at 155.

## Circumstantial evidence of a manufacturing defect

Plaintiffs contend they established a manufacturing defect because the tread separation in the middle of the tire's life was itself circumstantial evidence of a defect. Goodyear contends there is no evidence of a "flaw" because no witness testified the tire deviated from specifications or from Kelly Safari AWR tires manufactured in 1991.

■■■ Circumstantial evidence allows a factfinder to infer a fact to be proven by the circumstances shown by the proponent of the fact. *Turbines, Inc. v. Dardis*, 1 S.W.3d 726, 736 (Tex.App.-Amarillo 1999, pet. denied). "If the plaintiff has no evidence of a specific defect in the design or manufacture of the product, he may offer evidence of its malfunction as circumstantial proof of the product's defect." *General Motors Corp. v. Hopkins*, 548 S.W.2d 344, 349–50 (Tex.1977), *overruled in part on other grounds by Turner v. General Motors*, 584 S.W.2d 844, 851 (Tex.1979); *Ford Motor Co.*, 9 S.W.3d at 199; *Sipes*, 946 S.W.2d at 155. When a product does not function as it is designed, and there is

no evidence suggesting that anyone had tampered with it since it left the manufacturer, there is circumstantial proof of a defect. *Hopkins,* 548 S.W.2d at 349–50; *Sipes,* 946 S.W.2d at 155; *Temple EasTex, Inc. v. Old Orchard Creek Partners, Ltd.,* 848 S.W.2d 724, 732 (Tex.App.-Dallas 1992, writ denied). The age and use of a product during the time between purchase and malfunction may, however, defeat the circumstantial weight of the malfunction as proof of original defect. *Hopkins,* 548 S.W.2d at 350. A malfunction may be established by the testimony of the product's user or operator about the circumstances of the complained-of event. *Ford Motor Co.,* 9 S.W.3d at 199; *Sipes,* 946 S.W.2d at 155. However, the mere fact that an accident happens to a product is not sufficient proof the product was defective. *Rodriguez v. Ed Hicks Imports,* 767 S.W.2d 187, 192 (Tex.App.-Corpus Christi 1989, no writ).

 The only evidence of the circumstances of the accident came from Jimmie Davidson, a truck driver who was behind the Rios truck just before the accident. Tina could not remember the accident. At trial, Davidson testified that he was unable to see the accident because the Rios truck went over the crest of a hill, putting it momentarily out of his sight. As he came up to the top of the hill, he saw a cloud of dust up ahead, which blocked his view of the highway. He next saw the Rios truck in a ditch, with Raul laying on his back in or near the ditch. Later, while still at the scene of the accident, Davidson was questioned by a highway patrol officer. Davidson told the officer that it "appeared" the accident was caused because Tina "swerved to miss a piece of rubber[1] in the road which was laying a few yards back

down the highway." He said he did not tell the officer whether or not he had witnessed the accident, but he did tell the officer a "cloud of dust blocked my view from seeing what was going on, that when the dust cleared, well it had already happened." Davidson gave a written statement while at the scene, in which he stated, "Pickup turns to miss rubber in the road, lost control and rolled over two times, came to stop upright." At trial, he admitted he did not see the truck turn to miss any rubber in the road, and he did not see the truck roll over.

 Here, no witness could testify to the actual circumstances of the accident. Tina remembered nothing and Davidson said he did not see the accident, only its aftermath. We hold there is no circumstantial evidence that the tire malfunctioned; therefore, there is no circumstantial evidence establishing a manufacturing defect. And, any circumstantial evidence of a manufacturing defect is defeated by the age and condition of the tire. For these reasons, the plaintiffs' case rests entirely on the opinions offered by its experts, and not on any circumstantial evidence. *See Hopkins,* 548 S.W.2d at 348.

### Standard of Review on Expert Testimony

The plaintiffs offered the testimony of two experts to establish the existence of a manufacturing defect, Robert Ochs and John Crate. ' Goodyear asserts that the testimony of these experts provides no evidence of a manufacturing defect because the experts were either unqualified or their opinions were not reliable.

 The Texas Rules of Evidence provide that "[if] scientific, technical, or

---

1. At trial, the jury was shown pieces of rubber found at the accident site. Everyone agreed that all but one of the *pieces of rubber be*-longed to the damaged tire because the pieces fit together. However, there was one piece of *rubber that did not belong to the tire.*

other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX.R. EVID. 702. Whether a witness is qualified as an expert is within the trial court's discretion. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex.1995). To be reliable, the expert's testimony must be grounded in scientific method and procedure such that it amounts to more than subjective belief or unsupported speculation. *Id.* at 557. In *Robinson*, the Texas Supreme Court enumerated a list of factors to determine the reliability of expert testimony, including: (1) the extent to which the theory has or can be tested; (2) the extent to which the technique relies upon subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the nonjudicial uses that have been made of the theory or technique. *Robinson*, 923 S.W.2d at 557.

■ However, in *Gammill*, the Court held that the *Robinson* factors do not always apply to expert testimony because they do not always fit. *Gammill v. Jack Williams Chev., Inc.*, 972 S.W.2d 713, 726 (Tex.1998). "Experience alone may provide a sufficient basis for an expert's testimony in some cases, but it cannot do so in every case." *Id.* Regardless of whether the *Robinson* factors are applied, the proponent of the expert testimony must still prove that the testimony is reliable. *Id.* In such a case, the court must consider whether there is too great of an "analytical gap" between the data and the

expert's opinion. *Id.* The trial court's duty is not to determine whether the expert's conclusions are correct, but only whether the analysis used to reach them is reliable. *Id.* at 728. There must be some basis for the opinion offered to show its reliability. *Id.* at 726.

### Robert Ochs's testimony

■ On appeal, Goodyear does not challenge Ochs's qualifications; instead, Goodyear contends his opinions are not reliable because none of the *Robinson* factors are satisfied, and *Gammill* is not satisfied because Ochs offered nothing to establish the reliability of "his naked opinion." Where the trial court has admitted expert testimony and, on appeal, the appellant challenges the expert testimony as constituting "no evidence," we consider whether the expert testimony is reliable under a de novo standard of review. *Missouri Pac. R.R. Co. v. Navarro*, 90 S.W.3d 747, 750 (Tex.App.-San Antonio 2002, no pet.).

■ Ochs's opinion was based on demonstrable facts, which he observed either by touch or visually. He stated that tire manufacturers use certain failure analysis techniques and principles to adjust warranty claims, including (1) examination of the tire's exposed surfaces to determine the tire's condition, (2) whether those conditions included abuse, and (3) an examination of exposed surfaces to identify the surface's characteristics so that the characteristics can be related back to mechanisms such as abrasion or polishing. He testified there were a number of generally accepted explanations for the type of separation that occurred in this tire, including (1) the circumstances under which the tire was used, (2) the operation of the tire in a overdeflected state due to either underinflating the tire for a given load or using proper inflation but applying an excessive

load, (3) impact or trauma that causes a local fracture or failure of components in the belt that expands into a greater separation, (4) any of these conditions coupled with a manufacturing or design defect, (5) a design or manufacturing defect alone, or (6) operating the tire at an excessively high speed. He said his opinion was based on his experience, training, and background, as well as documents describing surface conditions and relating these conditions to materials used in construction of the tire.

Despite the tire's age and condition, Ochs concluded the tread separation resulted from a manufacturing defect. He testified the tire separated because of a lack of adhesion between the brass cable and the rubber over the cable, which he explained as follows. Poor adhesion allows the brass plating on the cable to separate from the rubber, which results in the cable ceasing to be part of the tire's structure. The cable separates, resulting in cracking and polishing of the cables. Exposed cable wires, the color of steel instead of brass, indicates polishing, *i.e.*, that the brass has been rubbed away and this was the beginning of the separation. The separation continues through the spread of the tire, resulting in enough of an area opening up so that the tread and upper belt, through centrifugal force, begin to lift away from the lower belt and carcass of the tire. Ochs admitted he had never seen the specifications for this tire, he conducted no tests on the tire other than visual and tactile, and he was not relying on any of the documents in a "museum" that contains various information about tire failures.

Goodyear asserts Ochs's purely visual and tactile test is unreliable because his technique is entirely subjective. We disagree. The issue is "not the reasonableness *in general* of a tire expert's use of a

visual and tactile inspection to determine [what] caused the tire's tread to separate from its steel-belted carcass." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153–54, 119 S.Ct. 1167, 1177, 143 L.Ed.2d 238 (1999) (emphasis in original). Instead, "it [is] the reasonableness of using such an approach, along with [the expert's] particular method of analyzing the data thereby obtained, to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant." Id.* at 154, 119 S.Ct. at 1177 (same). Here, as in *Kumho Tire*, that matter concerns the likelihood that a defect in the tire caused its tread to separate from its carcass. *See id.* Also here, as in *Kumho Tire*, the "relevant issue [is] whether the expert could reliably determine the cause of this tire's separation." *See id.*

In *Kumho Tire*, the expert relied on a specific theory to establish the existence (or absence) of abuse of the tire due to proportionately greater tread wear on the shoulder, signs of grooves caused by the beads, discolored sidewalls, and marks on the rim flange. The expert testified that in the absence of at least two of these four signs of abuse, he would conclude that a defect caused the separation. His analysis also depended upon acceptance of the implicit proposition that his visual and tactile inspection could determine the tire had not been abused despite some evidence of the presence of the very signs for which he looked. *Id.*

The *Kumho Tire* plaintiffs argued that employing a visual/tactile inspection was a reliable method to determine the cause of a tire's failure, and they relied on the use of this method by other experts and the expert's long experience working for Michelin as sufficient indication that a visual/tactile inspection was reliable. *Id.* at 156, 119 S.Ct. at 1178. However, the United States Supreme Court held as follows:

... But no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience. Nor does anyone deny that, as a general matter, tire abuse may often be identified by qualified experts through visual or tactile inspection of the tire.... As we said before, ... the question before the trial court was specific, not general. The trial court had to decide whether this particular expert had sufficient specialized knowledge to assist the jurors "in deciding the particular issues in the case." ....

The particular issue in this case concerned the use of Carlson's two-factor test and his related use of visual/tactile inspection to draw conclusions on the basis of what seemed small observational differences. We have found no indication in the record that other experts in the industry use Carlson's two-factor test or that tire experts such as Carlson normally make the very fine distinctions about, say, the symmetry of comparatively greater shoulder tread wear that were necessary, on Carlson's own theory, to support his conclusions. Nor, despite the prevalence of tire testing, does anyone refer to any articles or papers that validate Carlson's approach.... Indeed, no one has argued that Carlson himself, were he still working for Michelin, would have concluded in a report to his employer that a similar tire was similarly defective on grounds identical to those upon which he rested his conclusion here. Of course, Carlson himself claimed that his method was accurate, but, as we pointed out in *Joiner*, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."

*Id.* at 156, 119 S.Ct. at 1178 (citations omitted).

The analysis employed by the *Kumho Tire* Court applies here. Ochs attempted to rule out other possible causes for the tread separation. However, the issue concerns Ochs's use of visual/tactile inspection to conclude that a manufacturing defect was present without any evidence in the record indicating that other experts in the industry use Ochs's methodology (the existence of steel wires with little to no coverage of rubber) to determine that a manufacturing defect exists, as opposed to a defect caused by the use and abuse of the tire over time. Ochs did not refer to any article or publication that specifically supported his approach. For these reasons, his testimony was not reliable and, therefore, amounts to no evidence of a manufacturing defect.

**John Crate's testimony**

Goodyear asserts Crate was not qualified to render an opinion because he has no experience with tires outside the litigation setting; and no experience, education, or training in tire design, manufacture, or forensic analysis. Before a witness may testify as an expert about scientific, technical, or other specialized matters, the witness must be qualified as an expert. *United Blood Servs. v. Longoria*, 938 S.W.2d 29, 30–31 (Tex.1997). Whether a witness is sufficiently knowledgeable to be considered an expert is preliminarily a question for the trial court. *Id.; see* Tex.R. Evid. 104(a). Also, the qualifications of the expert must be measured against the particular opinions offered. *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex.1996). The determination of whether an expert witness is qualified to testify is left largely to the trial court's discretion, and we will not disturb it on appeal absent a showing that the court abused that discretion. *Id.* at 151.

Crate is a research scientist at the Georgia Institute of Technology in Atlanta, Georgia. He has a bachelor's degree in chemistry and a master's degree in polymer science and engineering. He received his master's degree in 2000. In the summer of 1991 before he began work at the Institute, he worked as an analytical chemist, which he did for about ten years, analyzing the failure of polymeric products and rubber. Although Crate's background includes research generally into the adhesion properties of various materials, none of his experience is specific to tires. He has no background in tires, and does not consider himself an expert on them. He admitted the vast amount of his experience in failure analysis has been related to products other than tires. He has tested a tire only once, to determine the presence of foreign substances. None of the texts upon which he relied to give his opinion in this case are specific to tires. Instead, the focus of the texts is adhesion, failure, and fracture surfaces generated on various surfaces. When asked if he has "performed any studies comparing surfaces where lack of adhesion is known to have been present at the time of manufacturing," he responded that his "master's thesis goes into quite [sic] detail on it. All kinds of testing of various levels of adhesion between the glass and the polypropylene." He worked on his thesis from 1996 through 2000, and it was published in a university journal. He has never done any studies to determine the effects of aging, puncture holes, torn or damaged beads, patched tires, and overloaded tires. Although this background may have enabled Crate to discuss adhesion failures generally, he was not qualified to opine on the specifics of the actual subject matter for which he was called to testify: whether the Rios's tire failed because of an adhesion defect present at the time of manufacture. Accordingly, we hold that Crate was not qualified as an expert in the field of tire failure analysis; therefore, his testimony amounts to legally insufficient evidence of a manufacturing defect.

### MARKETING DEFECT

A marketing defect cause of action consists of five elements: (1) a risk of harm that is inherent in the product or that may arise from the intended or reasonably anticipated use of the product must exist; (2) the product supplier must actually know or reasonably foresee the risk of harm at the time the product is marketed; (3) the product must possess a marketing defect; (4) the absence of the warning and/or instructions must render the product unreasonably dangerous to the ultimate user or consumer of the product; and (5) the failure to warn and/or instruct must constitute a causative nexus in the product user's injury. *USX Corp. v. Salinas*, 818 S.W.2d 473, 482–83 (Tex.App.-San Antonio 1991, writ denied).

On appeal, Mr. Rios asserts the marketing defect here is Goodyear's failure to warn and to instruct its ultimate users about the known hazards of repairing a puncture with only a patch, and not a patch and plug. Mr. Rios contends this defect rendered the tire unreasonably dangerous and was the producing cause of the tread separation. At trial, Goodyear did not deny that its tire did not contain a warning that punctures should be repaired with both a plug and a patch or that improper repair can result in serious injury.[2] We will assume without deciding that Goodyear could foresee the risk associated

---

2. The tire contained the following warning molded onto its sidewall: "Injury may result from tire failure due to underinflation, over-

load, follow owner's manual and tire placard in vehicle. Explosion of tire rim assembly

with improper repair of a tire puncture and failed to place a warning or instruction regarding such risk on the sidewall of the tire. However, based on our review of the record, we conclude there is no evidence to support the fourth element of Mr. Rios's claim.

■ A Goodyear tire consultant testified that tire manufacturers know how their tires should be repaired and standardized proper repair methods exist. This consultant stated that although tire manufacturers do not make their own tire-repair materials, manufacturers warn against improper tire repair and the tire industry is aware that people improperly repair punctures with only a patch. A Goodyear representative explained that tire manufacturers supply information addressing mounting procedures and repair procedures to companies that sell tires. The Rubber Manufacturers Association ("the RMA"), of which Goodyear is a member, also distributes information in the form of manuals, brochures, and wall charts. One such chart contains thirty-three different numbered warnings with regard to puncture repair procedures. The RMA's recommendation that a tire puncture be repaired with a patch and plug is the widely accepted repair method within the tire industry. Goodyear also distributes similar information.

At trial, Mr. Rios did not assert the warnings and instructions provided by the tire industry or any professional organization are inadequate. Instead, he contends Goodyear failed to place a warning *on its tires* regarding the danger of improper puncture repair, that punctures could cause tread separation, and that consumers should inspect their tires for cuts and cracks. Goodyear agreed it was feasible to place a warning on a tire that a puncture should be repaired with a plug and

patch, but to do so would require that another warning be removed from the tire's sidewall. More than one Goodyear witness stated that because there are so many issues with respect to tires (*e.g.*, underinflated operation or overloading) and so many instructions regarding mounting tires and observing the condition of a tire, it is not possible to include all possible instructions regarding the proper repair and maintenance of a tire on its sidewall.

In *Saenz*, the Texas Supreme Court noted:

Plaintiffs' argument that the warning could have been more prominent does not prove that it was not prominent enough. Every warning can always be made bigger, brighter and more obvious. GM could have placed the warning where it could not possibly have been overlooked, perhaps engraved upon the dashboard, or backlit on the instrument panel. But it clearly would not be possible for GM to place every important warning in such a position of maximum prominence. It can always be argued that a single instruction should have been given more prominence and if it had, an accident might have been prevented. This argument, however, must be considered in the context of the product involved. When, as here, it is important to give a number of instructions concerning the operation of a vehicle, not all of them can be printed on the dashboard. Indeed, the more instructions and warnings that are printed in one place-on the dashboard, on a doorplate, or in the owner's manual-the less likely that any one instruction or warning will be noticed.

*Saenz*, 873 S.W.2d at 360–61.

■ Similar reasoning applies here. Given the limited amount of space on a tire's sidewall and the many warnings and

due to improper mounting. Only specially trained persons should mount tires.''

instructions pertinent to the operation, mounting, maintenance, and repair of a tire, we conclude that expert testimony was required. A jury could not have determined, without the benefit of expert testimony, which, among many, warnings and instructions should be printed on a sidewall. When a lay person's general experience and common sense will not enable that person to determine the issue, expert testimony is required. *See* TEX.R. EVID. 702; *see also GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 620 (Tex.1999). Our conclusion is supported by the fact that Mr. Rios did not offer a proposed warning or any support for the notion that a warning regarding repair of punctures was more critical than warnings regarding underinflation or overload. Also, Mr. Rios presented no evidence to contradict the testimony of James Gardner, an independent tire consultant, that this tire did not need additional warnings.

At trial, Mr. Rios bore the burden of establishing each element of his cause of action. He presented no evidence to support his claim and none of the evidence on which he relies supports his claim that the absence of a warning and/or instruction on the tire's sidewall rendered the tire unreasonably dangerous to the ultimate user or consumer of the product. Because Mr. Rios did not carry his burden of proof on this element of his cause of action, we do not address whether the evidence is sufficient to support a finding on causation.

## CONCLUSION

The evidence is legally insufficient to support the jury's finding on the existence of a manufacturing defect and on the existence of a marketing defect; therefore, we must render judgment in Goodyear's favor on these claims.[3] We reverse the trial court's judgment in favor of Raul Rios, Sr. and render judgment that he take nothing on his claims against Goodyear Tire & Rubber Company.[4]

---

3. Plaintiffs contend that if this court sustains Goodyear's challenge to the experts' testimony on the manufacturing defect claim, remand is appropriate because it would not be fair to exclude testimony upon which they relied at trial. Plaintiffs' reliance on *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 409 (Tex.1998), for this argument misconstrues the holding in that case. The *Maritime Overseas* Court held that a party must object to the evidence before trial or when the evidence is offered in order to preserve a complaint that scientific evidence is unreliable and thus, no evidence. *Id.* To do otherwise would encourage trial by ambush. *Id.* Therefore, if a party does not timely object, a court should "not exclude expert scientific evidence after trial to render a judgment against the offering party because that party relied on the fact that the evidence was admitted." *Id.* Here, Goodyear repeatedly objected at the *Daubert* hearing and at trial to Ochs's and Crate's testimony.

4. Because we conclude the evidence is legally insufficient to support Mr. Rios's manufacturing defect and marketing defect claims against Goodyear, we do not address Goodyear's remaining issues on appeal because they are not necessary to the final disposition of this appeal. *See* TEX.R.APP. P. 47.1.