

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-14-00562-CV

Jesus **DE LOS SANTOS** Jr., Individually and as Representative of the Estate of Jesus Francisco
De Los Santos, Deceased, Juan De Los Santos, Individually, and Mark Soliz Jr.,
Appellants

v.

**FORD MOTOR COMPANY**,
Appellee

From the 79th Judicial District Court, Jim Wells County, Texas
Trial Court No. 11-08-50394-CV
Honorable Richard C. Terrell, Judge Presiding

Opinion by:     Marialyn Barnard, Justice
Dissenting Opinion by:  Rebeca C. Martinez, Justice

Sitting:        Karen Angelini, Justice
                Marialyn Barnard, Justice
                Rebeca C. Martinez, Justice

Delivered and Filed:  June 17, 2015

AFFIRMED

This is an appeal from a directed verdict in favor of Ford Motor Company ("Ford") in a

products liability case.[1]  On appeal, Jesus De Los Santos Jr., Individually and as Representative of

the Estate of Jesus Francisco De Los Santos, Juan De Los Santos, and Mark Soliz Jr.[2] (collectively

---

[1] The directed verdict was based on a manufacturing defect claim.  Issues regarding an alleged design defect were submitted to the jury, which found in favor of Ford.  The portion of the judgment relating to the design defect was not appealed.

[2] Although Mark Soliz Jr. identifies himself as a "cross-appellant," he is, in reality, an appellant.  *See* TEX. R. APP. P. 3.1 (defining "appellant" as "a party taking an appeal to an appellate court").  In his brief, Mr. Soliz adopts and fully incorporates the arguments of appellants Jesus De Los Santos Jr. and Juan De Los Santos.

"Appellants") raise a single issue, contending the trial court erred in granting a directed verdict in favor of Ford on Appellants' manufacturing defect claim. We affirm the trial court's judgment.

**BACKGROUND**

One evening, Mark Anthony Soliz Jr. was driving his family's 2005 Ford F-150 Super Crew pickup truck down a county road. Three of his friends, Joel Salinas and brothers, Jesus Francisco De Los Santos ("J.F. De Los Santos") and Juan De Los Santos, were riding with him. Juan De Los Santos was seated in the front passenger seat and J.F. De Los Santos and Mr. Salinas were seated in the left and right rear passenger seats, respectively. The group was on its way to Mr. Salinas's house when Mr. Soliz rounded a curve at an "unsafe speed," nearly swerving off the road. In an effort to prevent the truck from veering off the road, Mr. Soliz overcorrected, steering the truck sharply to the left. The truck skidded, rolled over onto the passenger side, and landed upside down. Mr. Soliz, Mr. Salinas, and Juan De Los Santos survived the accident without injury; however, J.F. De Los Santos, who was not wearing his seatbelt, was ejected through the left rear window and died at the scene. During the accident investigation, it was discovered that the right rear wheel assembly had broken and separated from the truck, causing the right rear wheel to detach from the truck.

Jesus Francisco De Los Santos Jr. and Juan De Los Santos filed suit against Ford on theories of strict products liability, breach of implied warranties, and negligence, alleging the truck's right rear wheel-to-axle assembly was defectively manufactured and designed. In addition to their claims against Ford, Jesus Francisco De Los Santos Jr. and Juan De Los Santos filed suit against Mr. Soliz and Mr. Soliz's father, alleging negligence. The Solizes then filed suit against Ford, also alleging Ford was liable for the defective manufacture and design of the right rear wheel-to-axle assembly. At trial, the core of the dispute centered on *when* and *why* the right rear wheel assembly broke and separated from the truck. The theory presented by Appellants was that the

axle broke *before* the truck rolled over because of a crack that developed during the manufacturing process. According to Appellants, because of the crack, the axle was more vulnerable than it normally would have been when under pressure.

In support of their manufacturing defect claim, Appellants offered the testimony of an engineering and metallurgy expert, Craig Clauser. According to Mr. Clauser, the axle failed, i.e., broke, because of a subsurface crack, which was the result of brittle steel. Mr. Clauser testified he analyzed the broken axle and found a tiny crack in the metal. It was his belief the crack weakened the strength of the axle and caused it to fail. He further opined that based on the location and nature of the crack, the crack predated the rollover and, in fact, caused the rollover. Mr. Clauser also testified he believed the type of steel Ford used for its axles contained a high phosphorus level, and during the heat treating process, the axle became "embrittled" and thus, more susceptible to cracking. He further opined that he believed a design defect existed, but the root problem stemmed from the manufacturing process.

Ford presented its own expert, Dr. Juan Herrera, a mechanical and metallurgical engineer, to testify about the axle's fracture. According to Dr. Herrera, the crack in the axle did not predate the accident, nor was the crack a result of the truck's initial slide. Rather, Dr. Herrera testified the crack in the axle was a direct result of the rollover, occurring when the wheels slammed down on the asphalt *after* the truck rolled over. Dr. Herrera also testified he sent the axle to an independent lab for testing. The lab performed several tests, and each test confirmed the axle conformed to Ford's specifications. Dr. Herrera stated the tests established the amount of phosphorus in the axle, 0.017 percent, was within Ford's specifications, which required axles to contain no more than 0.03 percent of phosphorus, as well as within the Society of Automotive Engineers' ("SAE")[3]

---

[3] According to the evidence at trial, SAE standards are internationally recognized for their role in ensuring safety, quality, and effectiveness of products in the mobility engineering industry.

specifications, which required axles to contain no more than 0.04 percent. Therefore, the axle was not defective, suggesting the crack was sustained as a result of the roll over.

After the parties rested, Ford moved for a directed verdict on, among others, the manufacturing defect claim, arguing Mr. Clauser's testimony related to the *design* of the axle rather than an alleged manufacturing defect. According to Ford, Mr. Clauser specifically failed to identify how the axle deviated from Ford's specifications as required to sustain a manufacturing defect claim. The trial court granted Ford's motion for directed verdict on the manufacturing defect claim and submitted to the jury only issues relating to the design defect claim. The jury found there was no design defect, and the trial court rendered a take-nothing judgment based on the jury's verdict and the directed verdict. This appeal followed.

## ANALYSIS

On appeal, Appellants contend the trial court erred in granting the directed verdict in favor of Ford on their manufacturing defect claim. According to Appellants, they produced evidence to support their claim that the axle was defectively manufactured. In response, Ford argues there is no evidence of a manufacturing defect because: (1) the evidence Appellants produced related to an alleged design defect as opposed to a manufacturing defect; and (2) Mr. Clauser's testimony was unreliable, thereby constituting no evidence.

### Standard of Review

A trial court may instruct a verdict in favor of a defendant if the plaintiff fails to present any evidence that raises a fact issue on the material questions in the suit or if the evidence conclusively proves a fact that establishes the movant's right to judgment as a matter of law. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Ibarra v. Nat'l Const. Rentals, Inc.*, 199 S.W.3d 32, 37 (Tex. App.—San Antonio 2006, no pet.) When determining whether a directed verdict was properly granted, we apply a legal sufficiency or no

evidence standard of review. *LG Ins. Mgmt. Servs., L.P. v. Leick*, 378 S.W.3d 632, 642 (Tex. App.—Dallas 2012, pet. denied); *Ibarra*, 199 S.W.3d at 37. Under this standard, "'we decide whether there is any evidence of probative value to raise an issue of material fact on the question presented, and we review the evidence in the light most favorable to the person suffering the adverse judgment.'" *Flying J Inc. v. Meda, Inc.*, 373 S.W.3d 680, 685 (Tex. App.—San Antonio 2012, no pet.) (quoting *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 220 (Tex. 2011)); *LG Ins.*, 378 S.W.3d at 642. In other words, we must determine whether the nonmovant produced more than a scintilla of probative evidence to raise a fact issue. *LG Ins.*, 378 S.W.3d at 642. "More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable, fair-minded persons to differ in their conclusions." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). A directed verdict is not proper when the nonmovant brings forth more than a scintilla of probative evidence, as viewed in the light most favorable to the nonmovant, to raise a genuine issue of material fact; in those cases, the issue must go to the jury. *Exxon Corp.*, 348 S.W.3d at 220–21; *King Ranch*, 118 S.W.3d at 751; *Flying J Inc.*, 373 S.W.3d at 685. We can consider any reason the directed verdict should have been granted, even if the reason is not stated in the party's motion. *Ibarra*, 199 S.W.3d at 37.

*Application*

A manufacturing defect exists when a product deviates, in its quality or construction, from the specifications or planned output in a manner that makes it unreasonably dangerous. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 41–42 (Tex. 2007); *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006); *Goodyear Tire & Rubber Co. v. Rios*, 143 S.W.3d 107, 111 (Tex. App.—San Antonio 2004, pet. denied). A plaintiff must prove the product was defective when it left the hands of the manufacturer and that the defect was a producing cause of the plaintiff's injuries. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 844 (Tex. 2000). The plaintiff

need not identify exactly how the defect came into being, only that the defect can be traced to the manufacturer. *Goodyear Tire*, 143 S.W.3d at 111. Furthermore, neither direct evidence nor expert testimony is required to establish the existence of a manufacturing defect. *Id*. Often, a manufacturing defect can be proven only by circumstantial evidence, which is evidence that allows one to infer a fact based on the circumstances shown by the proponent of the fact. *Id*.

At trial, Appellants relied on the expert testimony of Mr. Clauser to prove the existence of a manufacturing defect with regard to the axle. Mr. Clauser testified he analyzed the broken axle and found a tiny subsurface crack in the metal. According to Mr. Clauser, the crack, based on its location and nature, more than likely caused the rollover. Mr. Clauser testified he did not believe that every axle manufactured by Ford contained a crack like the axle in this case, and it was highly likely the crack was a direct result of Ford's "choice of recipe," i.e., using steel with a high phosphorous content. Mr. Clauser explained that because of the high phosphorous content, the steel became "embrittled" during the heat treating process, and as a result, it was more susceptible to cracks. Mr. Clauser also testified he believed Ford did not intend to manufacture brittle axles; rather, the axle was an unintended manufacturing defect. Mr. Clauser noted that Ford's expert, Dr. Herrera, opined that properly manufactured axles were capable of sustaining bending loads of more than 100,000 "inch pounds" or more. Mr. Clauser opined that in this case, the axle snapped at 40,000 to 50,000 "inch pounds," breaking at half the load a standard axle should be able to bear. Accordingly, Mr. Clauser believed the axle deviated from the expected standard — i.e., it contained a crack caused by embrittled steel — and failed to remain intact when sideways frictional forces were exerted upon it as the truck slid during the accident.

We hold that after viewing Mr. Clauser's testimony in a light most favorable to Appellants, it fails to demonstrate how the axle deviated in its construction or quality from Ford's specifications or planned output. *See iLight Technologies Inc. v. Clutch City Sports &*

*Entertainment, L.P.*, 414 S.W.3d 842, 847 (Tex. App.—Houston [1st Dist.] 2013, pet denied) (highlighting that it is necessary to show manufacturer's actual specifications or planned output for product to prove manufacturing defect); *Ledesma*, 242 S.W.3d at 41-42. At no point did Mr. Clauser testify about what Ford actually required with regard to axle specifications, if anything, vis-à-vis brittleness. Furthermore, there is nothing in the record showing what Ford's specifications or planned output in fact was with respect to brittleness or how much weight an axle was required to bear. Rather, Mr. Clauser's testimony merely shows how the axle may have deviated from Ford's *performance* standards, which were established by Dr. Herrera's testimony. Performance standards describe the intended result of a product, but do not indicate anything about the product's technical specifications or design. *See Casey v. Toyota Motor Engineering & Mfg. North America, Inc.*, 770 F.3d 322, 328 (5th Cir. 2014). Case law is clear that evidence that a product deviated from a performance standard is not evidence that a product deviated from its specifications or planned output. *See id.*; see *also iLight Technologies Inc.*, 414 S.W.3d at 847. Here, Ford's expert testified properly manufactured axles were capable of sustaining bending loads of 100,000 "inch pounds" or more, and Mr. Clauser testified the axle snapped at 40,000 to 50,000 "inch pounds," indicating it performed below an expected performance standard — testimony that is irrelevant to establishing a manufacturing defect.

In support of their contention that Mr. Clauser's testimony was sufficient to establish a manufacturing defect, Appellants rely on *Johnson Controls Battery Group, Inc. v. Runnels*, No. 12-01-00183-CV, 2003 WL 21191063 (Tex. App.—Tyler May 21, 2003, no pet.) (op. on reh'g, mem. op.). In *Runnels*, a car battery exploded after only twenty months of use and injured Runnels. *Id*. at *6. Runnels sued Johnson Controls, alleging a manufacturing defect. *Id.* at *1. Runnels relied on expert testimony from Edward Mrotek, a principal engineer in the product design group at Johnson Controls, to prove the existence of a manufacturing defect. *Id.* After determining Mr.

Mrotek's testimony was reliable, the appellate court reviewed Mr. Mrotek's testimony to determine whether it was sufficient to permit the jury to find a manufacturing defect existed with regard to the subject battery. *Id.* at \*5-\*6. The expert testified that 95% of Johnson Controls batteries lasted longer than the subject battery, and the subject battery "did not meet the standard." *Id*. at \*6. Based on this evidence, the court held there was sufficient evidence to permit the jury to find a manufacturing defect existed because the expert's testimony established some evidence that Johnson Controls had a standard regarding the expected life span of its batteries, and the battery in question did not meet that standard. *Id.* at \*6.

Here, unlike the expert in *Johnson Controls*, neither Mr. Clauser nor Dr. Herrera presented any evidence that Ford had a *standard* regarding brittleness or the weight an axle was required to sustain without breaking. Admittedly, Dr. Herrera testified properly manufactured axles were capable of sustaining bending loads of 100,000 "inch pounds" or more; however, there was no testimony this was a Ford standard. In fact, in their post-submission letter brief, Appellants admit Ford did not have a specification or test for the brittleness of the steel or its propensity to break when loaded sideways. The law is clear that to prove a manufacturing defect claim, a plaintiff must present evidence of a product's "deviation from specifications or planned output." *See Ledesma*, 242 S.W.3d at 41; *Cooper Tire & Rubber Co.*, 204 S.W.3d at 800; *Goodyear Tire & Rubber Co.*, 143 S.W.3d at 111.

Admittedly, in the absence of evidence of a standard, evidence that a product was treated in an unintended manner can establish a manufacturing defect claim. *See iLight Technologies Inc.*, 414 S.W.3d at 848 (looking at whether appellant presented any evidence that product was manufactured in configuration unintended by appellee). However, in this case there is no evidence Ford treated the axle in an unintended manner or manufactured the axle in an unintended configuration, i.e., that it failed to follow the "recipe." *See id*. In fact, Appellant's own expert

believed Ford followed its intended configuration, but he disagreed with Ford's recipe, i.e., he believed the phosphorous amounts were too high. When posed with the following statement, "You're saying that Ford didn't follow the recipe. Ford did follow the recipe. You're just saying you disagree with the recipe," Mr. Clauser stated, "Yes, I disagree with the recipe." In short, it is possible Ford did exactly what it intended to do with respect to manufacturing the axle, but Ford utilized a steel that became "embrittled" during the heat treating process. Thus, according to Mr. Clauser's testimony, the defect, if any, in the axle is a design defect (a bad recipe) rather than a manufacturing defect (failure to follow the recipe), and as noted above, issues regarding an alleged design defect were submitted to and rejected by the jury. *See id.* at 849 (pointing out product's specifications or planned output may have taken into consideration certain manufacturing processes and quantified them and in hindsight such processes may be matter of design defect).

Accordingly, after reviewing the evidence in the light most favorable to Appellants, we hold Appellants failed to present a scintilla of probative evidence to establish the axle deviated in its construction or quality from Ford's specifications or planned output or that Ford treated the axle in an unintended manner or manufactured the axle in an unintended configuration. *See Exxon Corp.*, 348 S.W.3d at 220–21; *King Ranch*, 118 S.W.3d at 751; *Flying J Inc.*, 373 S.W.3d at 685. Because there was no evidence to establish a manufacturing defect, the trial court did not err in granting the directed verdict as to the manufacturing defect claim.

## CONCLUSION

Based on our foregoing analysis, we overrule Appellants' sole appellate issue. We hold the trial court did not err in granting a directed verdict in favor of Ford on Appellants' manufacturing defect claim because Appellants failed to produce any evidence to establish the axle deviated from Ford's specifications or planned output or that Ford treated the axle in an

unintended manner or manufactured the axle in an unintended configuration.  Accordingly, we affirm the trial court's judgment.

Marialyn Barnard, Justice