COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  | § |  |
| --- | --- | --- |
| JESUS ZAVALA, JR., | | No. 08-10-00169-CV |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | County Court at Law No. 5 |
| | § | |
| BURLINGTON NORTHERN SANTA FE | | of El Paso County, Texas |
| CORPORATION, | § | |
| | | (TC # 2008-734) |
| Appellee. | § | |

## **O P I N I O N**

Jesus Zavala, Jr. filed suit against Burlington Northern Santa Fe Corporation (BNSF) alleging strict products liability, premises liability, and negligence for personal injuries sustained while attempting to open a railcar hopper door to unload sugar. BNSF filed a motion for summary judgment asserting it was entitled to judgment as a matter of law as to all of Zavala's claims. The trial court granted BNSF's motion in its entirety and Zavala appeals. He brings three issues for review: (1) the trial court erred generally in granting summary judgment; (2) the trial court erred in granting summary judgment on his strict products liability claims; and (3) the trial court erred in granting summary judgment on his negligence and premises liability claims. For the reasons that follow, we affirm.

**FACTUAL BACKGROUND**

Jesus Zavala, Jr. worked for Randstad North America, L.P., an employment agency that assigns employees to various other agencies. At the time of the incident, Zavala was assigned to Commodity Specialists Company, LLC (CSC). Zavala's duties at CSC included loading and unloading BNSF hopper rail cars. The hopper cars are loaded from the top with sugar, grain, or pellets. The cars are designed such that as the granular material is loaded, it is funneled to a rectangular section at the bottom of the car. The car is then unloaded from the bottom through a door at the end of a chute. The door on the chute is opened and closed by rotating the "chute door-opening mechanism." One method of opening the chute door is to insert a metal rod into a hole in the opening mechanism and pushing or pulling the bar, causing the opening mechanism to rotate and the door to slide open.[1] The device used to turn the opening mechanism, i.e. the metal rod, is furnished by the industry and is not supplied by BNSF.

Zavala sustained his injury on or about January 17, 2007, while attempting to open one of the chute doors using a metal rod furnished by CSC. He contends he properly inserted the bar into the opening mechanism, but was unable to open the door on his own. At that point he asked for help and Tomas Cadena and Jesus Castaneda came to assist him. Zavala alleges the opening mechanism was stuck, but it ultimately gave way when the three men exerted pressure on the rod, injuring his right wrist in the process. According to Zavala, the chute door opening mechanism was owned and operated by BNSF and failed to operate as required, thus causing his injuries. He further alleges the chute door opening mechanism was unreasonably dangerous and unsafe.

---

[1] Zavala's supervisor, Sergio Lopez (also a Randstad employee) trained him to use the metal rod method to open the chute doors.

Zavala could not identify the exact car which injured him or pinpoint any specific defect on the car. He did not see the hopper car again, but he identified the opening mechanism on a BNSF model 450 car as the "same or substantially similar hopper loading mechanism I was injured on."

On the date of injury, Zavala was on duty from 3 p.m. until 11 p.m, and the incident occurred at approximately 4:30 p.m.[2] According to the BNSF spotting record, no model 450 cars were on site at any time during Zavala's shift that day. However, there was a model 450 series car on the spotting record, car No. 450678 which was released at 12 p.m. Car No. 450678 was inspected, photographed, and videotaped.

## STANDARD OF REVIEW

Summary judgment procedure allows the trial court to promptly dispose of cases involving unmeritorious claims or untenable defenses. *City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671, 678 n.5 (Tex. 1979). To prevail on a summary judgment, the movant has the burden of proving that there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. TEX.R.CIV.P. 166a(c); *Diversicare General Partner, Inc. v. Rubio,* 185 S.W.3d 842, 846 (Tex. 2005); *De Santiago v. West Texas Community Supervision & Corrections Department,* 203 S.W.3d 387, 398 (Tex.App.--El Paso 2006, no pet.). Once the movant establishes a right to judgment as a matter of law, the burden shifts to the non-movant to produce evidence raising a genuine issue of material fact. *Clear Creek Basin Auth.*, 589 S.W.2d at 678-79. In deciding whether there is a disputed material fact precluding summary judgment, we take as true evidence favorable to the non-movant, indulging every reasonable inference and resolving any doubts against the

---

[2] Zavala contends that he reported the injury to his supervisor who allegedly failed to file an injury report. The first injury report that appears in the record in dated February 13, 2007. However, Zavala did introduce a doctor's report at his deposition dated January 22, 2007 which notes a complaint of right wrist pain.

motion. *Provident Life and Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex.2005). We cannot affirm a summary judgment on grounds other than those specified in the motion. TEX.R.CIV.P. 166a(c). However, where as here, the trial court grants a summary judgment without stating its grounds for doing so the reviewing court will affirm if any theory advanced in the motion below is meritorious. *Provident Life and Accident Ins. Co. v. Knott*, 128 S.W.3d at 215; *Painter v. Momentum Energy Corp.*, 271 S.W.3d 388, 393 (Tex.App.--El Paso,2008, pet. denied).

## NEGLIGENCE AND PREMISES LIABILITY

We begin with Issue Three wherein Zavala complains of summary disposition of both his negligence and premises liability claims.

### Negligence

The negligence of which Zavala complains involves conduct relating to the unreasonably dangerous condition of the hopper car opening mechanism. To simplify the analysis below, we first dispose of his ordinary negligence claims.

In addition to his strict products liability and premises liability claims, Zavala alleged that BNSF was negligent under a laundry list of negligence theories, all of which tie directly to allegations that BNSF negligently designed, marketed, and/or assembled the hopper car opening mechanism and placed it into the stream of commerce in a defective condition.[3] Generally, Zavala

---

[3] Specifically, Zavala alleged the following alternative theories of negligence: (1) Negligent operation and maintenance of hopper chute door; (2) failure to keep the hopper chute doors in a safe operating condition; (3) failure to provide training to Plaintiff as to the operation of the hopper chute doors; (4) failure to provide proper training to its agents, representatives, and employees as to the operation and maintenance of the hopper chute doors; (5) failing to maintain the hopper chute doors; (6) failure to provide adequate means of communication to enable its agents, representatives, and employees to inquire or obtain guidance from their employer on how to safely perform their job;

alleges that BNSF was negligent because the hopper car did not work safely for the foreseeable uses, BNSF knew of these problems before placing the hopper car into the stream of commerce, and such acts proximately caused Zavala's injuries. He claims BNSF owed a duty, breached that duty, and caused damages by one or more of thirty-one alternative negligence theories. Zavala also relied on the doctrine of *res ipsa loquitor.*[4]

The Dallas Court of Appeals has addressed a similar situation and found that where the appellant alleged no negligence other than conduct relating to whether the product was unreasonably dangerous when sold, the negligence theories were, "encompassed and subsumed in their defective product theories, and appellants' burden at trial would be to prove injury resulting from a product defect." *Shaun T. Mian Corp. v. Hewlett-Packard Co.*, 237 S.W.3d 851, 857 (Tex.App.--Dallas

_____

(7) failure to furnish Plaintiff with adequate, necessary, and suitable tools, appliances, and equipment; (8) failure to properly educate, instruct, and supervise Plaintiff in the performance of his duties; (9) failure to warn Plaintiff of the dangers; (10) failure to have a safety plan; (11) failure to warn of hazards associated with this risk; (12) in placing the "Hopper Car" chute door into the stream of commerce when defendant knew it had failed safety tests, including those on the hinge, folding mechanism, and metal bending strength; (13) using metal on the chute door without adequate testing and endurance testing; (14) failing to test the metal used in the "Hopper Car" chute door opening mechanism; (15) failing to instruct in the safe use of the "Hopper Car" chute door opening mechanism; (16) failing to provide labels on how to prevent the "Hopper Car" chute door mechanism from injuring operators; (17) representing the "Hopper Car" chute door opening mechanism was safe when it was not; (18) negligent inspection of the "Hopper Car" chute door opening mechanism; (19) negligent testing of the "Hopper Car" chute door opening mechanism; (20) failure to provide adequate instructions on how to safely use the product; (21) failure to recall the product; (22) advertising and representing the product was safe when it was not; (23) failure to use due care in testing and inspecting the "Hopper Car" chute door opening mechanism; (24) failure to provide adequate warnings of the risk of accidents while using the "Hopper Car" chute door opening mechanism; (25) failure to warn Plaintiff of the risks associated with using the "Hopper Car" chute door opening mechanism; (26) failure to advise potential buyers and users of the hazards involved in the operation of the "Hopper Car" chute door opening mechanism; (27) failure to use due care in testing and inspecting the "Hopper Car" chute door opening mechanism. (same as number 23); (28) failure to supply safety equipment or devices to ensure the product would operate safely; (29) failure to keep reasonably informed and advised of available public and private reports, complaints, studies, statistics, and other information concerning the type, nature, and frequency of injury while using the "Hopper Car" and the number, nature, and severity of injuries and resulting from the same; (30) failure to discover the problems of using the product before supplying it to Plaintiff; (31) other negligence.

[4] Zavala's petition appears to assert *res ipsa loquitor* as a distinct cause of action. But it is not a separate cause of action independent of a negligence cause of action; it is "simply a rule of evidence by which negligence may be inferred by the jury." *Haddock v. Arnspiger*, 793 S.W.2d 948, 950 (Tex. 1990). Thus, we address it in connection with the ordinary negligence cause of action. *See Shaun T. Mian Corp.*, 237 S.W.3d 851, 856-57 (Tex.App.--Dallas 2007, pet. denied).

2007, pet. denied), *citing Ford Motor Co. v. Miles*, 141 S.W.3d 309, 315 (Tex.App.--Dallas 2004, pet. denied) and *Simms v. Southwest Texas Methodist Hosp.*, 535 S.W.2d 192, 197 (Tex.Civ.App.--San Antonio 1976, writ ref'd n.r.e.). Therefore, any error in disposing of the negligence claims could not have, "caused the rendition of an improper judgment or prevented appellants from properly presenting their case to this Court." *Id. citing* TEX.R.APP.P. 44.1(a). We similarly conclude that Zavala's right to recover stands or falls on the outcome of his products liability claims. *See id.*

**Premises Liability**

Zavala also suggests that the summary judgment evidence raised genuine issues of material fact as to the premises liability claims raised against BNSF. Premises liability is a type of ordinary negligence action brought by someone who claims to have been injured by a condition of the property, as opposed to an action brought by someone who claims to have been injured by a negligent activity on the property. *See Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992). The elements for the two causes of action are essentially the same in that both invoke the concepts of duty, breach, and causation.

The threshold inquiry in a negligence case, including one of premises liability, is "whether the defendant owes a legal duty to the plaintiff." *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995); *see Berry Property Management, Inc. v. Bliskey*, 850 S.W.2d 644, 654 (Tex.App.--Corpus Christi 1993, writ dism'd). In describing "duty," the Texas Supreme Court has stated generally that "if a party negligently creates a situation, then it becomes his duty to do something about it to prevent injury to others if it reasonably appears or should appear to him that others in the exercise of their lawful rights may be injured thereby." *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987), *quoting Buchanan v. Rose*, 138 Tex. 390, 159 S.W.2d 109, 110

-6-

(1942).

As a general rule, a railroad has a duty to use reasonable care to furnish a car that is reasonably safe and free from any dangerous condition of which it either knew or, through the exercise of reasonable care, should have known. *Kansas City Southern Railroad Company v. Guillory*, 376 S.W.2d 72, 75 (Tex.Civ.App.--Beaumont 1964, writ ref'd n.r.e.). "The duty is not due an invitee that the premises be altered or changed to obviate known and obvious dangers for he takes the premises as they are. The occupier of premises has no duty to warn a business invitee of dangerous condition that are obvious, reasonably apparent or as well known to the person injured as they are to the owner or occupier." *Id*. (internal citations omitted).

When determining the duty of an owner and occupier of premises, the right to control the premises is usually the most important factor. *See Butcher v. Scott*, 906 S.W.2d 14, 15 (Tex. 1995)(reasoning that defendant's beneficial ownership of premises did not constitute a right to control the premises, defendant owed no such duty to plaintiff, and could not be liable for criminal acts of a third party). Courts have held that the right to control requires direct evidence of actual control or right of control rather than a determination based on inferences. *See Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 23 (Tex. 1993)(requiring an inquiry into whether defendant had specific control over the safety and security of the premises, rather than allowing the fact finder to draw inference from defendant's more general control over operations).

In his petition, Zavala alleged BNSF is liable for his injuries under a theory of premises liability because BNSF: (1) negligently caused or negligently permitted a dangerous condition under its ownership and control, of which BNSF knew or, in the exercise of ordinary care, should have known, to exist; or (2) BNSF negligently failed to warn Zavala of the dangerous condition despite

-7-

the fact that BNSF knew or, in the exercise of ordinary care, should have known of the existence of the condition and the likelihood of an injury such as plaintiff's occurring. BNSF responded through its motion for summary judgment asserting that Zavala produced no evidence of a defect in or dangerous condition on the hopper car Zavala was attempting to open at the time of the incident.

We affirm a traditional summary judgment if the evidence submitted in support of the motion and any response shows that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. TEX.R.CIV.P. 166a(c). As discussed above, the summary judgment evidence establishes as a matter of law that Zavala failed to present evidence creating a fact issue as to the existence of a defect, or of a dangerous condition which was not known or obvious. Therefore, BNSF met their burden of proof for summary judgment and the trial court did not err in awarding such relief. Issue Three is overruled in its entirety.

## STRICT PRODUCTS LIABILITY

In Issue Two, Zavala argues that the evidence raised genuine issue of material fact as to his strict products liability claims, precluding summary judgment. In support of his argument, he sets forth seven contentions which are best divided into three categories: (1) general liability under strict products liability claims; (2) he produced more than a scintilla of evidence as to a design defect; and (3) he provided more than a scintilla of evidence as to a marketing defect.

Texas strict products liability claims are governed by Section 402A of The Restatement (Second) of Torts. *American Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 426 (Tex. 1997); *Firestone Steel Products Co. v. Barajas*, 927 S.W.2d 608, 613 (Tex. 1996). Under Section 402A:

> (1) one who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

-8-

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

RESTATEMENT (SECOND) OF TORTS §402A (1965). The rule enunciated in the Restatement applies to any person engaged in the business of selling products for use or consumption. *Id.* comment F. Although phrased in terms of sellers, the defendant need not actually sell the product. Rather, the rule requires only that the defendant be engaged in the business of introducing the product into channels of commerce. *See Rourke v. Garza*, 530 S.W.2d 794 (Tex. 1975). The product, however, must reach the user in essentially the same condition as when it left the seller's possession. RESTATEMENT (SECOND) OF TORTS § 402A(1)(b). The rule applies even where the seller has exercised care in the preparation and sale of the product and even though the user has not purchased the product or entered into any contractual arrangement with the seller. RESTATEMENT (SECOND) OF TORTS §402A(2).

In his petition, Zavala alleged that "[t]he BNSF Hopper Railcar chute door and mechanism (herein after referred to as "Hopper Car") was dangerous, defective and unsafe for its intended and/or foreseeable uses and purposes at the time it was being used." With respect to his strict products liability claim, Zavala complained that the hopper car "did not work safely for foreseeable uses," and that it was "in an unreasonably dangerous and defective condition as designed, marketed, assembled and/or placed into the stream of commerce by [BNSF] and was a producing cause of the . . . injuries sustained by [Zavala]." He also argued that the hopper car was "expected to and did reach [Zavala] without substantial change in the condition in which it was sold and/or distributed by [BNSF]." Finally, he asserted that BNSF issued no warnings or instructions, or alternatively

inadequate warnings and instructions to potential users regarding this alleged dangerous condition.

"A product may be unreasonably dangerous because of a defect in marketing, design, or manufacturing." *American Tabacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 426 (Tex. 1997). Under the theory of strict liability, Zavala bore the burden of proving (1) the defective and unreasonably dangerous condition of the defendant's product; and (2) a causal connection between such condition and the plaintiffs' injuries or damages. *See Armstrong Rubber Co. v. Urquidez*, 570 S.W.2d 374, 376 (Tex. 1978).

### *Manufacturing Defect*

Products liability imposes strict liability on the manufacturer of an unreasonably dangerous product that is a producing cause of a plaintiff's injuries. *See Firestone Steel Products Co.*, 927 S.W.2d at 613; *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787, 788–89 (Tex. 1967). Implicit in the "unreasonably dangerous" element is the requirement that the plaintiff show that the defendant placed the product in the stream of commerce. *See Armstrong Rubber*, 570 S.W.2d at 376. A manufacturing defect exists "when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). As stated above, although phrased in terms of sellers, the defendant need not actually sell the product. Rather, the rule requires only that the defendant be engaged in the business of introducing the product into channels of commerce. *See Rourke v. Garza*, 530 S.W.2d 794 (Tex. 1975).

Zavala maintains that BNSF is liable as a seller, focusing on the definition of "seller" under Texas Civil Practice and Remedies Code Section 82.001(3). In contrast, BNSF's motion for summary judgment focuses more on the stream of commerce element, arguing Zavala has not met

his burden of proof showing BNSF supplied the product which allegedly injured Zavala.

Zavala concedes that he cannot identify the hopper car which caused his injury, but he contends there is no need for him to identify the *exact* hopper car so long as he can identify the *type* of hopper car opening mechanism which malfunctioned at the time of injury. He identifies the car as the BNSF model 450.

According to his pleadings, Zavala sustained his injury on or about January 17, 2007. As we have noted, his shift that day was from 3 p.m. to 11 p.m. and the injury occurred at approximately 4:30 p.m. As part of its summary judgment evidence, BNSF submitted a spotting report as well as an affidavit from Larry Enslinger, the BNSF Director of Demurrage, Storage and Extended Service, which explained the report. The spotting report lists cars that were at CSC and available for unloading on a particular date. According to the report, the following cars were available to unload on January 17, 2007 between 1 p.m. and midnight: BNSF 400754, BNSF 400794, BNSF 400951, BNSF 400787, and BNSF 401057. All of these cars are model 400 cars. The Enslinger affidavit further shows that the only BNSF 450 model series cars at CSC on January 17, 2007, were removed before noon that day, three hours before Zavala's shift started and approximately four and a half hours before the injury occurred. Zavala also introduced a list of hopper cars that were on site on January 17, 2007. His list, also derived from a BNSF Demurrage Storage Report, shows no 450 model cars on site during his shift either. It does show that a BNSF 450 car was released at 9 a.m.

While we take as true Zavala's allegation that the incident occurred **on or about** January 17, 2007, he must still demonstrate a genuine issue of material fact that a product defect exists. Since he cannot identify the specific car which caused his injuries, he must show more than a scintilla of evidence that all BNSF model 450 cars possess a manufacturing defect. Ignoring for a moment

-11-

BNSF's argument they did not manufacture the cars, Zavala has failed to present any evidence that all model 450 cars deviated, in terms of construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous. *See American Tabacco Co., Inc.*, 951 S.W.2d at 434. The trial court did not err in granting summary judgment to the extent Zavala's pleadings assert a manufacturing defect.

Assuming, without deciding, that BNSF qualified as a seller and placed the product into the stream of commerce, we must still decide whether Zavala presented sufficient evidence of a specific defect in all model 450 cars which render them unreasonably dangerous under a defective design or marketing claim.

### *Design Defect*

A strict products liability claimant alleging design defect must prove that the product was defectively designed so as to render it unreasonably dangerous. *See Timpte Industries, Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009). Texas courts apply a risk-utility analysis that requires consideration of the following factors: (1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and (5) the expectations of the ordinary consumer. *Id.* The risk-utility analysis operates in the context of the product's intended use and its intended users. *Id.* at 312. Although whether a product is defective

is generally a question of fact, in the appropriate case, it may be determined as a matter of law. *Id.* Related to this element is the existence of a safer alternative design. *See* TEX.CIV.PRAC.&REM. CODE ANN. § 82.005(a)(1)(West 2005); *Timpte Industries, Inc.*, 286 S.W.3d at 311.

Zavala identifies the defective product as the chute door opening mechanism on the hopper car. He argues the evidence he presented creates a fact issue as to the existence of a defect design based on the depositions and affidavits presented, as well as evidence of a safer alternative design. It is immaterial, he continues, that he cannot identify the exact model 450 car which caused his injury because the opening mechanisms on all BNSF model 450 cars are defective and unreasonably dangerous.

Both direct and circumstantial evidence may be used to establish any material fact. *Lozano v. Lozano*, 52 S.W.3d 141, 149 (Tex. 2001); *Ridgway*, 135 S.W.3d at 601; *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex. 1993). Thus, a plaintiff is not required to show by direct proof how the product became defective or to identify a specific engineering or structural defect. *See id.*; *V. Mueller & Co. v. Corley*, 570 S.W.2d 140, 143 (Tex.Civ.App.--Houston [1st Dist.] 1978, writ ref'd n.r.e.). If the plaintiff "has no evidence of a specific defect in the design or manufacture of the product, he may offer evidence of its malfunction as circumstantial proof of the product's defect." *General Motors Corp. v. Hopkins*, 548 S.W.2d 344, 349-50 (Tex. 1977), *overruled in part on other grounds by Turner v. General Motors Corp.*, 584 S.W.2d 844, 851 (Tex. 1979); *Sipes v. General Motors Corp.*, 946 S.W.2d 143, 155 (Tex.App.--Texarkana 1997, writ denied). A malfunction may be shown by testimony of the user about the circumstances surrounding the event in question. *Sipes*, 946 S.W.2d at 155.

However, "[t]he inference of defect may not be drawn . . . from the mere fact of a

product-related accident." *Ridgway*, 135 S.W.3d at 602, *quoting* Restatement (Third) of Torts: Products Liability § 3 reporter's note to cmt. D (1998). Proof of a product failure, standing alone, is not sufficient to raise a fact question as to whether the product was defective or that it was defective when it left the hands of the manufacturer. *See Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 807 (Tex. 2006). To raise a genuine issue of material fact, the evidence must transcend mere suspicion. Evidence that is so slight as to make any inference a guess is in legal effect no evidence. *Lozano*, 52 S.W.3d at 148; *Browning-Ferris*, 865 S.W.2d at 928.

Zavala relies on the rule that a plaintiff who has no evidence of a specific design defect may offer evidence of the product's malfunction as circumstantial proof of the defect. He directs us to two cases in support of his argument. First, in *Shaun T. Mian Corp.*, the plaintiffs (property owners and a purchaser of a fax machine) brought a products liability claim against the manufacturer alleging the fax machine was defective and caused a fire. *Shaun T. Mian Corp.*, 237 S.W.3d at 854. The printer arrived from the manufacturer in a sealed, undamaged box. *Id*. The purchaser followed the instructions in setting up the printer and nothing was ever spilled on the printer nor was it ever repaired or modified. *Id*. at 855-56. At the time of the fire some two months later, the printer was the only electrical device plugged in, and the printer power supply was the only electrical device at floor level. *Id*. Until the day of the fire the printer performed without any apparent problems. *Id*. at 856. The printer was severely damaged in the fire (the most damaged piece of property in the office), but the plaintiffs were unable to identify the specific design defect within the printer which caused the incident. *Id*. The manufacturer filed a motion for summary judgment which the trial court granted. *Id*. Due to the waiver of other issues, the appellate court focused on the manufacturing defect claim. *Id*. It examined several different opinions and summarized its analysis

-14-

with the following six observations:

First, the evidence is sufficient to avoid summary judgment when, viewing all the evidence in the light most favorable to the non-movant and indulging every reasonable inference and resolving any doubts against the motion, more than a scintilla of probative evidence exists as to whether: (1) the product was defective when it left the hands of the manufacturer; and (2) the defect was a producing cause of the plaintiff's injuries. Such evidence must do more than create a mere surmise or suspicion with respect to these two elements. Thus, if the evidence is such as to render any inference of these elements no more than a guess, it is insufficient. This is merely a restatement of the summary judgment standard of review in the specific context of a manufacturing defect claim.

Second, '[b]oth direct and circumstantial evidence may be used to establish any material fact.' Thus, the 'more than a scintilla' of evidence necessary to avoid summary judgment on a manufacturing defects claim can be supplied through direct evidence, circumstantial evidence, or a combination of both.

Third, however, for circumstantial evidence to support an inference that the product was defective, it must do more than raise the possibility the injury *could have resulted* from a defect. This is because the product's failure, standing alone, provides no more than a basis for guessing as to whether the product was defective or whether it failed as a result of other causes. For circumstantial evidence to support an inference that the product was defective, it must provide a reasonable basis for concluding the injury would *not* ordinarily have occurred absent a *defect*. [Emphasis in original.]

Fourth (and similar to the third observation), for circumstantial evidence to support an inference that the defect existed when it left the manufacturer, it must do more than raise the possibility the defective condition *could have existed* at that time. Again, this is because evidence that the product failed, standing alone, provides no more than a basis for guessing as to whether the product was defective when it left the manufacturer's control. For the circumstantial evidence to support such an inference, it must provide a reasonable basis for concluding the defective condition *did not arise subsequent* to the manufacturer's exercise of control over the product. [Emphasis in original.]

Sometimes this basis can be provided by evidence of the age of the product and its history of usage up to the time of failure. 'The age and use of [a] product during the time intervening between [its] purchase and malfunction will tend to support or defeat the circumstantial weight of the malfunction as proof of original defect.' New or nearly new products 'typically have not been modified or repaired, therefore making a product defect the likely cause of an accident.' Thus, an inference of

original product defect may be warranted from the malfunction of a relatively new or sealed product. However, such an inference may not be warranted if the product was worn, misused, damaged, repaired, or altered after it left the manufacturer's control.

Fifth, for circumstantial evidence to support inferences that a product was defective and the defect existed at the time it left the manufacturer, the evidence need not disprove all other possible causes for the injury. For example, the plaintiff is not required to exclude an appreciable chance that the event might have occurred in some other way. Expressed otherwise, a conclusion of causal connection may be inferred by a balance of probabilities. However, the likelihood of other possible causes must be so reduced that the fact-finder could reasonably find by a preponderance of the evidence that the cause of the product failure lies at the manufacturer's door.

Sixth, a number of inferences may be drawn from a single fact situation. Thus, circumstantial evidence can give rise to both the inference of a product defect and the inference that the defect existed at the time of sale. However, an inference stacked only on other inferences is not legally sufficient evidence. This principle is illustrated in *Turbines, Inc.*, in which the plaintiff used one inference (that the engine's bleed valve must have failed because the expert excluded the possibility of malfunction in the other engine systems) as the sole circumstantial evidence supporting another inference (that there was a defect of an unknown type in the bleed valve).

*Id*. at 862-64. (internal citations omitted; internal quotation marks omitted). Based on all the evidence, the court concluded that reasonable minds could differ as to whether the printer caused the fire. *Id*. at 868-69.

Similarly, in *Ford Motor Co. v. Gonzalez*, 9 S.W.3d 195 (Tex.App.--San Antonio, 1999, no pet.), the driver and passenger of an automobile filed a products liability action against the automobile's manufacturer after sustaining damages in a roll-over accident, claiming a manufacturing defect, a marketing defect, negligence, and Deceptive Trade Practices Act violations. *Gonzalez*, 9 S.W.3d at 195. A jury found in favor of the plaintiffs on all causes of action and Ford Motor appealed. *Id*. at 196. The appellate court noted that because the case involved a car accident, the plaintiffs must present expert testimony, "to piece together for the jury the evidence that

something was wrong with the car from the beginning." *Id*. at 199-200. The court reiterated the rule regarding circumstantial evidence of a product's defect and concluded that based on all the evidence, "the jury heard sufficient evidence to reach its decision on liability on any one of [the] four theories of liability." *Id*. at 200.

Here, Zavala relies upon the deposition testimony of Tomas Cadena, Jesus Castaneda, and David Renteria as evidence that the hopper car door malfunctioned at the time of injury. Thomas Cadena testified: "Defective? I'd say they're all defective because they're hard to open." Similarly, Zavala testified:

> It probably collapsed or -- I think it was defective -- something in there was defective or something gave way. I don't know. It just gave way. I don't know. I couldn't tell you, because at that time I was -- you know, I was just worrying about opening the boxcar and making sure it was secure. So it had to be something inside that -- probably something that was defective in there.

He also relies upon Dr. Huerta's affidavit. Dr. Huerta calculated the estimated amount of torque applied by three men opening the door and opined that: "If the system is working properly a smaller amount of torque should be required to open and close the door." Zavala then builds on Dr. Huerta's opinion by alleging that the opening mechanism was defective because it was located underneath the hopper car and open to the environment such that, "with time and use, [the system] is subject to malfunction." Dr. Huerta provided his testimony based on the examination of BNSF model 450 car which was onsite the day of the alleged incident but, according the spotting report, left the site prior to Zavala's shift. The affidavit, together with Zavala's pleadings, identify the following conditions which can cause the system to jam or lock up: (1) debris in the gear system; (2) corrosion anywhere in the mechanism; (3) a warped or dented door; (4) debris in the grooves where the door slides; (5) a faulty seal that would allow moisture in and the sugar to solidify in door grooves and/or on the door

surface; and (6) damaged gears. Zavala further argues that the evidence he tendered demonstrated that chute doors should not be difficult to open; therefore, the fact he had to ask for assistance of two other employees proves the opening mechanism malfunctioned. Lastly, he contends that there is proof of a design defect because he presented evidence of a safer alternative design.

BNSF counters that without identifying the specific hopper car or any specific defect on the car examined, Zavala's speculation that the door was defective in insufficient to raise a fact question. It points to Zavala's inability to contradict the evidence that no model 450 series car was on site at the time of the accident and Zavala's failure to proffer evidence that the product was defectively designed and unreasonably dangerous. BNSF also urges that evidence of a safer alternative design is insufficient to sustain a design defect claim. We agree.

Global assertions that all model 450 doors were defective because they were all hard to open does not create more than a mere suspicion of a defect. We decline to hold that a hard-to-open door is necessarily a malfunction, or that circumstantial proof of a hard-to-open door suffices to demonstrate a design defect. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583-84 (Tex. 2006)(circumstantial evidence that fire quickly reached driver following truck rollover, although consistent with plaintiffs' theory that fire originated from allegedly defective fuel system and location of ignition sources, "does not make it more likely than not that the battery or some other allegedly improperly located ignition source ignited diesel from the tractor, as opposed to other possible sources of ignition such as the cargo of crude oil"); *General Motors Corp. v. Iracheta*, 161 S.W.3d 462, 470-72 (Tex. 2005)(mere possibility that fire in truck occurred in manner plaintiff suggested was not enough to support jury's findings). Stacking inferences is insufficient to create a fact issue precluding summary judgment.

-18-

Although evidence of an alternative safer design may assist in proving a design defect, proof of an alleged safer alternative design is not enough to sustain a defective design claim. *See* TEX.CIV.PRAC.&REM.CODE ANN. § 82.005(a)(1); *Timpte Industries, Inc.*, 286 S.W.3d at 311; *see also Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 256 (Tex. 1999)(proof of an alternative safer design does not negate the common law requirement that the alleged defect renders the product unreasonably dangerous); *Sipes*, 946 S.W.2d at 156 ("A design defect exists if a safer alternative design existed *and 'the defect* was a producing cause of the personal injury, property damage, or death for which the claimant seeks recovery.'" [Emphasis added.]).

Even viewing the evidence in a light most favorable to Zavala, we find he failed to present sufficient evidence to create a genuine issue of material fact as to the existence of a design defect which rendered all model 450 cars unreasonably dangerous.

### *Marketing Defect*

Finally, we address Zavala's allegations relating to strict products liability based on a marketing defect. A defendant's failure to warn of a product's potential dangers when warnings are required is a type of marketing defect. *Caterpillar, Inc. v. Shears*, 911 S.W.3d 379, 382 (Tex. 1995). Liability will attach if the lack of adequate warnings or instructions renders an otherwise adequate product unreasonably dangerous. *Id.* There is no duty to warn when the risks associated with a particular product are matters "within the ordinary knowledge common to the community." *Id.* (recognizing "the duty to warn is limited in scope, and applies only to hazards of which the consumer is unaware").

Additionally, the law of products liability does not require a manufacturer or distributor to warn of obvious risks. *Caterpillar*, 911 S.W.2d at 382; *see also Grinnell*, 951 S.W.2d at 426;

*Lozano v. H.D. Industries, Inc.*, 953 S.W.2d 304, 314 (Tex.App.--El Paso 1997, no pet.)("A party has no duty to warn of obvious risks, since a readily apparent danger serves the same function as a warning."); *Hanus v. Texas Utilities Co.*, 71 S.W.3d 874, 880 (Tex.App.--Fort Worth 2002, no pet.)("a manufacturer has no duty to warn of obvious risks because a readily apparent danger serves the same function as a warning"); *Roland v. DaimlerChrysler Corp.*, 33 S.W.3d 468, 469 (Tex.App.--Austin 2000, pet. denied)("In Texas, a manufacturer has no duty to warn of open and obvious dangers."). Thus, there is only a duty to warn of risks about which the consumer is unaware. Caterpillar, 911 S.W.2d at 382.

The consumer's perspective is not necessarily the same as that of an ordinary person who is unfamiliar with the product, but rather, that of an ordinary user of the product. *Sauder Custom Fabrication, Inc. v. Boyd*, 967 S.W.2d 349, 351 (Tex. 1998). Moreover, "[w]hen the foreseeable users of a product have special training, a supplier has no duty to warn of risks that should be obvious to them, even if persons without such training would not appreciate the risks." *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 183 (Tex. 2004).

The existence of a duty to warn of the dangers or instruct as to the proper use of a product is a question of law. *Joseph E. Seagram & Sons, Inc. v. McGuire*, 814 S.W.2d 385, 387 (Tex. 1991); *Grinnell*, 951 S.W.2d at 426. Likewise, "[w]hether a danger is open and obvious as a matter of law is an objective question for the court to determine." *Lozano*, 953 S.W.2d at 314.

Zavala and the other employees all testified that the hard-to-open doors were a common occurrence, and they often called for help to apply force instead of reporting the door's condition. Zavala also testified that his supervisor at CSC instructed him on how to open the doors and at the time of the injury he had opened several doors, including hard-to-open ones, and did not need

instruction. It is undisputed that CSC chose to use the metal rod method of opening the doors and CSC, *not* BNSF, supplied the device.

BNSF established that Zavala had actual knowledge of the dangers posed by the doors. Zavala failed to present any evidence sufficient to create a fact issue as to the necessity of warnings or instructions. BNSF had no duty to warn of an open and obvious risk of which the plaintiff was aware. *See Horak v. Pullman*, 764 F.2d 1092, 1094 (5th Cir. 1985). Because summary judgment was appropriate as to Zavala's strict products liability claim, we overrule Issue Two. Having overruled the specific arguments against summary judgment, we likewise overrule global Issue One and affirm the judgment of the trial court.

August 24, 2011

ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Rivera, JJ.