# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-25-00750-CV

---

**C. R. F., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 155TH DISTRICT COURT OF FAYETTE COUNTY
NO. 2024V-025, THE HONORABLE JEFF R. STEINHAUSER, JUDGE PRESIDING**

---

## C O N C U R R I N G   A N D   D I S S E N T I N G   O P I N I O N

Termination of parental rights is the death penalty of civil cases. *In re J.W.*, 645 S.W.3d 726, 751 (Tex. 2022). Our role as the reviewing court is that of the coroner, not executioner. *Cf.* Oral Argument at 47:30; *In re H.S.*, No. 24-0307 (Tex.), https://www.youtube.com/watch?v=BAeOdYdS1Pw. And if, as here, our inquest reveals that the parent-child relationship has a breath of life yet in it, we must refrain from sounding the final death knell. Because the evidence is legally and factually insufficient to support the trial court's finding that termination of Mother's parental rights is in her children's best interest, I respectfully dissent in part.[1]

---

[1] I concur with the Court's conclusions that the evidence is legally and factually sufficient to support the predicate grounds for termination and that the Department engaged in reasonable efforts toward reunification. I also concur with the Court's decision to affirm appointment of the Department as permanent-managing conservator, not for the reason stated by the Court, but because the trial court did not abuse its discretion by finding that this appointment

# I. STANDARD OF REVIEW

"The natural rights which exists between parents and their children is one of constitutional dimension." *D.V. v. Texas Dep't of Fam. & Protective Servs.*, 722 S.W.3d 854, 858 (Tex. 2025) (citation modified) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)). "This natural parental right has been characterized as 'essential,' 'a basic civil right of man,' and 'far more precious than property rights.'" *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). To do so, the Department must show by clear and convincing evidence that termination of the parent-child relationship is in the child's best interest. *In re J.W.*, 645 S.W.3d at 740 ; *see* Tex. Fam. Code §§ 101.007, 161.001(b). "'Clear and convincing evidence' means a 'measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be stablished.'" *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam) (quoting Tex. Fam. Code § 101.007); *see Santosky*, 455 U.S. at 769 (holding that clear and convincing standard "conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process"). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

Given this higher burden of proof at trial, there is also a heightened standard of review on an appeal from an order terminating the parent-child relationship. *In re A.B.*,

---

was in the children's best interest. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (explaining that "[b]ecause different standards apply, evidentiary review that results in a reversal of a termination order may not yield the same result for a conservatorship appointment"); *M.D. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00531-CV, 2021 WL 1704258, at *12–13 (Tex. App.—Austin Apr. 30, 2021, no pet.) (mem. op.).

437 S.W.3d 498, 502 (Tex. 2014). In determining the sufficiency of the evidence to support such an order, we "must undertake 'an exacting review of the record with a healthy regard for the constitutional interests at stake.'" *Id.* at 503 (quoting *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002)). The Court correctly states the standards for our legal and factual sufficiency reviews. However, in reviewing the evidence, it rests its decision on evidence that legally weighs nothing.

## II.    BEST-INTEREST FINDING

The evidence relevant to the best-interest finding in this case falls into two categories: post- and pre-removal evidence.

### A.    Evidence of Post-Removal Behavior

Per the Court, the evidence of post-removal behavior indicating that termination is in the children's best interest includes evidence that (1) the boys' placement is a good one, (2) the Department was uncertain whether Mother was sober, and (3) Mother was hostile in her communications with the Department and the children's placement. None of this evidence can rationally support a best-interest finding.

Allison Brugger, the CASA, testified that the children had been in their current placement for about three months. Aside from a conclusory statement that the placement was willing to care for the boys on a "long-term" basis, no evidence was presented as to what the placement's plans were for the child or whether the placement was willing to adopt. Brugger testified that the transition "has been a little bumpy" but that the boys were doing well and their poor "behaviors have basically dissipated." Regardless, the best interest standard does not allow termination simply because the children might be "better off" living elsewhere. *C.C. v. Texas*

3

*Dep't of Fam. & Protective Servs.*, 653 S.W.3d 204, 217 (Tex. App.—Austin 2022, no pet.). I would not conclude that evidence that the boys are doing well supports termination. *See id.*

The Department was "unsure" if Mother was sober or had a safe home. But "[t]he absence of evidence cannot be used as if it were clear and convincing evidence supporting a termination finding." *In re J.D.G.*, 570 S.W.3d 839, 854 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). Mother testified that she had not failed any drug tests during the pendency of the case, and no one from the Department rebutted this testimony. The Department conceded that Mother was on parole for much of this case and that she was required to drug test as a condition of her parole. Ashley King, a Department caseworker, testified that, since Mother moved during the pendency of the case, Mother was required to find a place in New Mexico that would drug test her. However, it is undisputed that Mother did find a place in New Mexico to drug test her, as she regularly drug-tested as part of her parole. And, according to Mother, she never once failed any of these drug tests. King conceded that the Department did not ask for the results of the drug tests she took while on parole and argued that those tests "would not be random." But neither King nor anyone else from the Department testified regarding any dates when the Department asked Mother to drug test and she either failed the drug test or refused to test. Indeed, King testified that she had "not seen any negative or positive drug tests for" Mother.

It was not Mother's burden to prove that she was sober and stable; it was the Department's burden to prove that she was not. *See In re D.T.*, 34 S.W.3d 625, 641 (Tex. App.—Fort Worth 2000, pet. denied); *In re K.W.*, No. 01-23-00530-CV, 2024 WL 116938, at *7 (Tex. App.—Houston [1st Dist.] Jan. 11, 2024, pet. denied) (mem. op.). The trial court was not obliged to treat as credible Mother's testimony that she did not test positive for any drugs. But we should not reverse the applicable burden of proof and infer by omission that the evidence the

4

Department was "unsure" about exists. Because the record contains no evidence that Mother used substances during this case or that her current home is unsafe, I would not conclude that Mother's alleged lack of sobriety and stability is any evidence in support of the best-interest finding.

The Department also called Mother "hostile" and claimed she harassed both the boys' placement and the Department's caseworkers. But an assertion that Mother was "hostile" or harassing, without some sort of factual basis to support this, does not support termination. *See In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.) ("[C]onclusory testimony, . . . even if uncontradicted[,] does not amount to more than a scintilla of evidence."). True, Mother requested a welfare check on the boys on the date they flew from Texas to Kentucky. But the facts underpinning this request justify its occurrence. Brugger testified that the boys were originally supposed to leave Texas "at 2:20 in the afternoon." Instead, they left "around 9:30 p.m." The Department did not inform Mother of this delay. Because the day the boys left was the day that Mother would typically have visitation, she testified that the Department told her she "would get a phone call or a video visit from the airport." But Mother did not receive a phone call or video visit.

King testified regarding this incident as follows:

> Q. And when [Mother] last communicated with you or the Department, she thought you guys were going to take a 2:00 o'clock flight, correct?
>
> A. Yes.
>
> Q. And so would it be strange or unusual to call the police to do a welfare check when she hasn't heard from the Department or placement and it's now midnight and the children still aren't home or—aren't at placement?

5

A.        No.

Q.        But yet you testified that was erratic behavior?

A.        I believe that she was already in contact with [the placement] and knew that we were on our way.[2]

Q.        Did you yourself let her know?

A.        No, I don't think so.

Q.        Did she reach out to you?

A.        Yes, earlier in the evening.

Q.        And so how long would it have taken to send her a message or make a phone call and say, Hey, [Mother], the flight was delayed. We're not going to get there until after midnight.  Don't worry, I'll let you know when the kids are there safe?

. . . .

A.        A minute.

Q.        And yet you didn't do it?

A.        No.

I cannot conclude that a welfare check is outside the realm of reasonable reactions when children are flying across state lines with virtual strangers, those children are several hours late, the strangers ignore Mother's requests for status updates, and the only person providing any assurances is not with the children.  Mother need not have waited until her children were harmed before taking steps to ensure their safety.  There was no evidence that the welfare check bothered the placement, and, more importantly, the boys were apparently unfazed by the welfare check.

---

   [2]  No context was provided for why King believed this.  *See In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *38 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.) ("A single statement without context provides insufficient evidence to support a finding" that termination is in children's best interest.).

Three other facts were adduced in support of the assertion that Mother's behavior was hostile or harassing. First, King stated, "I have text messages in my phone where she asks for my employee badge and has made threats to make complaints and reports." These text messages were not admitted into evidence. King acknowledged that if Mother was unsatisfied with her job performance, she had the option to complain in whatever manner "she feels most comfortable with." But King testified that it "was the general tone of the messages" that made her feel "unsafe." However, once again, the Department refused to provide any detail about what was inappropriate about Mother's tone. The Constitution discourages jailing individuals simply for being rude to the police, *see* U.S. Const. amend. I & IV, and we should not terminate parental rights when a parent's "tone" through text messages is interpreted as hostile, *cf. In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) ("[T]he purpose of the State's intervention in the parent-child relationship is to protect the best interests of the children, not to punish parents for their conduct.").

Moreover, though I join the Court to the extent it holds that precedent constrains our conclusion as to whether the Department's efforts were reasonable, I am not convinced that the Department's efforts were above complaint in this case. Indeed, even the Department acknowledged that its actions in this case were unacceptable. Specifically, King testified:

> Q. And do you know if either [of the caseworkers] made any kind of notes about their communication with [Mother]?
>
> A. Their notes in our system are very sporadic.
>
> Q. Is that common?
>
> A. No.

7

Q.    Is that even acceptable?

A.    No.

King also testified that the children sustained minor injuries while in the Department's custody but was "not a hundred percent sure if [Mother] was or wasn't" notified of these injuries. I would not conclude that Mother's threat to file a complaint in this case was any evidence tending to prove that termination of her parental rights was in the children's best interests, especially given the Department's concession that its employees did not always perform their jobs in an acceptable manner.

Second, Brugger testified that Mother harassed the children's placement. As support for this, Brugger testified, "At some point there was a comment like if she wasn't able to have her visit that was scheduled on July 4th, that it would not be good. Of course, those weren't the words but the general gist." But it would shock the conscience if the Department disagreed with the statement that "it would not be good" for Mother to miss her visitation with the children. Again, I would not conclude that this communication, which veers on objective fact, was in any way harassing.

Lastly, the Department suggested that Mother ignored court orders. Junelia Walton, another Department caseworker, testified that she had "seen text messages where mom has been trying to get in touch with the children when it's . . . . court-ordered for her to not have contact." However, Walton could not provide a date for when these messages were sent. Walton also testified that the messages were not sent directly to the children, but to third parties and that "[s]he just wanted to know how the boys were doing, if she could have any kind of pictures, and the other one was . . . for the boys to call her." Workers for the Department acknowledged that Mother was not present at the hearing at which her contact with the children

8

was limited. Mother testified that as soon as she was aware of the court's order, she had no further communication of this nature. This testimony was unrebutted. Accordingly, there is no evidence that Mother knowingly ignored any court orders.

Apart from this, there was no evidence that Mother's communications were inappropriate.[3] And without that evidence, the record does not reflect any post-removal behavior that could justify termination. In closing, counsel for the Department "agree[d Mother] worked services." *See In re T.M.P.*, 417 S.W.3d 557, 569 (Tex. App.—El Paso 2013, no pet.) ("Stipulations of fact are binding on the parties."). But the Department and CASA believed that Mother's intentions for completing her service plan were impure. Specifically, both the Department and CASA hypothesized that Mother was just completing her service plan to get her children back, rather than to enact lasting change in her life. Speculation alone cannot support any civil judgment, much less one that must be supported by clear and convincing evidence. *See Coastal Transp. Co. v. Crown Cent. Petrol. Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) ("Opinion testimony that is conclusory or speculative . . . . cannot support a judgment."); *Zavala v. Burlington N. Santa Fe Corp.*, 355 S.W.3d 359, 372 (Tex. App.—El Paso 2011, no pet.) ("[A]n inference stacked only on other inferences is not legally sufficient evidence.").

---

[3] There is no evidence that it did so, but to the extent that the trial court considered any evidence presented at prior hearings concerning Mother's conduct towards either the Department or the children's placement, it would have erred. *See In re E.F.*, 591 S.W.3d 138, 142 n.4 (Tex. App.—San Antonio 2019, no pet.) ("Although we recognize the trial court and the parties in this proceeding had many hearings before the date of trial, we emphasize that none of the previous hearings constitute evidence that can support the trial court's order terminating a parent's rights."); *see also In re E.M.*, No. 11-24-00310-CV, 2025 WL 1240792, at *8 n.4 (Tex. App.—Eastland Apr. 30, 2025, no pet.) (mem. op.) ("Texas courts have repeatedly expressed concerns regarding underdeveloped records in parental termination cases and often must explain that 'none of the [matters presented at] previous hearings constitute evidence that can support the trial court's order terminating a parent's rights.'" (collecting cases)).

9

The record is replete with evidence indicating that Mother loved her children and that her children loved her. Mother regularly made the ten-hour drive from her residence in New Mexico to visitation in Texas to spend time with her children, drawings the boys made for her and family photos were admitted into evidence, and Mother testified that at least one of the boys had difficulty parting when it was time for visitation to end. Although the attorney ad litem recommended termination, he acknowledged that Mother loved her children and that his opinion on termination vacillated regularly throughout the case. *See In re E.S.-A.*, No. 07-25-00118-CV, 2025 WL 2396579, at *4 (Tex. App.—Amarillo Aug. 18, 2025, no pet.) (mem. op.) (reversing termination of parental rights where "[c]omments throughout trial described the case as 'a close call,' 'this is a tough case,' and the ad litem's recommendation for termination was accompanied by 'it is close'"). Accordingly, the post-removal evidence in this case does not weigh in favor of termination.

**B.      Evidence of Pre-Removal Behavior**

Most of the evidence the Court relies on occurred before the boys' removal. But "[e]ven when the evidence supports termination on endangerment grounds, the outcome of the best-interest inquiry is not a foregone conclusion." *In re C.C.*, 720 S.W.3d 41, 65 (Tex. App.—Texarkana 2025, no pet.). Our sister court said it best:

> We are mindful that evidence supporting one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *See In re C.H.*, 89 S.W.3d at 28. But such evidence does not relieve the Department of its heightened burden of proof to show best interest by 'clear and convincing' evidence. *In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.). We also acknowledge that a trier of fact may measure a parent's future conduct by past conduct and determine whether termination of

10

parental rights is in a child's best interest. *See id.  See also In re E.C.R.*, 402 S.W.3d 239, 249–50 (Tex. 2013).

However, if a parent's misconduct prior to the Department's initiation of termination proceedings is used against that parent in order to seek termination and that parent has successfully worked services toward the goal of family reunification, then what was the purpose of the service plan in the first place?  Would it not have been in the best interests of the children to admit up front that the ultimate end was termination anyway?  Because we understand that the goal of reunification and the rights of the parties to be of paramount interest, we believe the fact finder must give deferential weight and consideration to the relative success of the parent when it comes to completion of the reunification service plan.

*In re C.A.M.*, 633 S.W.3d 68, 76 (Tex. App.—Amarillo Aug. 17, 2021, no pet.); *see In re Z.B.*, No. 01-25-00273-CV, 2025 WL 2832223, at *14 (Tex. App.—Houston [1st Dist.] Oct. 7, 2025, no pet.) (mem. op.) ("[W]e agree with the Amarillo Court of Appeals, which acknowledged the injustice of considering only pre-removal behavior when the evidence shows that the parent has worked the services recommended by the Department and ordered by the court in order to accomplish the goal of safely reunifying with her child."); *In re A.C.P.*, No. 04-24-00653-CV, 2025 WL 900127, at *9 (Tex. App.—San Antonio Mar. 25, 2025, no pet.) (mem. op.) (concluding evidence was legally insufficient to support best-interest finding in part because "while there was clear and convincing evidence of endangerment *pre*-removal, the record contains paltry evidence of *post*-removal facts").

If a parent committed acts that, in the Department's eyes, are insufficient to abandon the goal of reunification altogether, it should not then be permitted to solely rely on those acts in support of an assertion that termination is in the child's best interest.  *See In re C.A.M.*, 633 S.W.3d at 76.  Stated otherwise, the Department should not be permitted to dangle the carrot of reunification while always intending to use the stick of termination hiding behind its

11

back. Despite Mother's past, the Department created a family service plan that purportedly outlined what Mother was required to do to reunify with her children. And per the Department's concession, Mother completed those tasks. Yet, the Department, relying heavily on Mother's past and its professed inability to provide her with services, ultimately recommended termination. I cannot countenance such a shell game could possibly be in the best interest of these children, whose hopes of reunification built up throughout this case, only to be ultimately dashed by things Mother could not change.

Even assuming the Court applies the appropriate weight to evidence of Mother's pre-removal behavior, much of the evidence of that behavior suffers from the same pitfalls as the evidence of the post-removal behavior. For instance, the main source of evidence concerning Mother's prior involvement with CPS in New Mexico is Mother's own testimony. Again, the trial court need not have credited Mother's testimony that New Mexico CPS largely had no reason for removing her children from her care or investigating her family, but the Department was responsible for presenting some evidence about those prior cases. Aside from the evidence indicating Mother ran away with the children after CPS placed them in a foster home after learning of Frank's father's criminal conduct, there does not appear to be any evidence indicating the reasons for New Mexico CPS's prior involvement with this family. Additionally, Frank's father's violent behavior, of which little evidence was elicited at trial and over which Mother had no control, is not relevant to the best-interest finding, given that it occurred in the distant past, Mother is no longer in a relationship with Frank's father, and he received a thirty-seven-year prison sentence for his criminal conduct. *See In re C.E.K.*, 214 S.W.3d 492, 496 (Tex. App.—Dallas 2006, no pet.); *Colbert v. Department of Fam. & Protective Servs.*, 227 S.W.3d 799, 812 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (where mother's boyfriend received life

12

sentence for abusive conduct, boyfriend was "no longer a threat to the children's safety" and "there is no evidence that the children will be emotionally or physically endangered by being returned to" mother).

Overall, the evidence that the Court weighs in favor of the trial court's judgment amounts to no more than a scintilla of evidence. Both our state and federal constitutions demand more. *See Santosky*, 455 U.S. at 769; *Wiley*, 543 S.W.2d at 352 ("Actions which break the ties between a parent and child 'can never be justified without the most solid and substantial reasons.'" (quoting *State v. Deaton*, 54 S.W. 901 (Tex. 1900)). Accordingly, I would hold that the evidence is legally and factually insufficient to support the court's finding that termination was in the children's best interest, and I would reverse the trial court's judgment.

## III.    INCONVENIENT FORUM

Lastly, I question the wisdom of exercising jurisdiction in this case. This case did not take place in Texas because this family calls Texas home. This case took place in Texas solely because Mother committed a crime in Texas and the Department delayed in finding a suitable home for the children. Neither Mother nor the children will likely come back to Texas as anything other than tourists ever again. Why, then, should Texas be the final resting place of this family's bonds?

The Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) was not raised below as an issue potentially precluding the exercise of jurisdiction over this matter. *See, e.g.*, Tex. Fam. Code ch. 152. That being said, we have previously explained that the UCCJEA implicates a trial court's subject-matter jurisdiction over a custody case. *See, e.g., In re K.M.P.*, 323 S.W.3d 601, 604–05 (Tex. App.—Austin 2010, pet. denied). *But see In re D.S.*,

13

602 S.W.3d 504, 518 (Tex. 2020) (Lehrmann, J., concurring) ("[A] court's lack of 'jurisdiction' under the [UCCJEA] does not equate to a lack of 'subject matter jurisdiction' that deprives the court of the power to hear and decide the case . . . ."). "[S]ubject-matter jurisdiction cannot be waived or conferred by agreement, and we have a duty to consider a question of subject-matter jurisdiction sua sponte because the district court's power to decide the merits, as well as our own, rests upon it." *Good Shepherd Med. Ctr. v. State*, 306 S.W.3d 825, 837 (Tex. App.—Austin 2010, no pet.); *In re L.N.A.H.*, 665 S.W.3d 907, 910 (Tex. App.—Houston [14th Dist.] 2023, no pet.). There are different ways a court may acquire jurisdiction over a custody case; as relevant here, if Texas is not the home state of the children at the commencement of the proceedings, it may nonetheless exercise "temporary emergency jurisdiction" over the case.[4] *See* Tex. Fam.

---

[4] The affidavit in support of removal specified that Mother and the children had been living out of her car in Texas for an unspecified period of time, but that their current address was in New Mexico and that they had no other place of residence during the past six months. Thus, Texas did not have home-state jurisdiction at the inception of this case. *See* Tex. Fam. Code § 152.102(7) (defining "home state" in relevant part as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding"); *id.* § 152.201(a)(1); *In re Salminen*, 492 S.W.3d 31, 40 (Tex. App.—Houston [1st Dist.] 2016, orig. proceeding) (where no evidence established amount of time mother and child had resided in Texas at time of commencement of suit, Texas lacked home-state jurisdiction).

I would also note that the trial court found that no other court had continuing, exclusive jurisdiction over these children. But Mother testified that she had previously been arrested for custodial interference. Only one of two things can be true: (1) Mother interfered with a child custody determination issued by a New Mexico court, in which case, New Mexico had continuing, exclusive jurisdiction and only New Mexico could make the decision to issue further orders concerning these children or to relinquish jurisdiction to Texas, *see* N.M. Stat. § 30-4-4 (for parent to commit custodial interference, there must be "a judgment or order of a court of competent jurisdiction providing for the custody of a child, including visitation rights"); Tex. Fam. Code §§ 152.102(3), (8), (12), .203, .204; *Saavedra v. Schmidt*, 96 S.W.3d 533, 548–49 (Tex. App.—Austin 2002, no pet.) ("We reiterate that the trial court's assumption of temporary emergency jurisdiction does not include jurisdiction to modify the California court's child custody determination."); or (2) New Mexico never issued an initial custody determination, in which case Mother committed no offense, but Texas could exercise jurisdiction and issue a final

14

Code § 152.204(a). Texas "has temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subject to or threatened with mistreatment or abuse." *Id.* But the term "temporary" should not be ignored. If a custody case commences in another state that has jurisdiction or if Texas does not become the children's home state during the pendency of the suit, the Texas court does not have jurisdiction to proceed to a final custody determination. *See id.* § 152.204(b); *A.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-23-00089-CV, 2023 WL 3956859, at *4 (Tex. App.—Austin June 13, 2023, pet. denied) (mem. op.). Based solely on the amount of time the Department spent searching for an appropriate placement for the children while they remained in foster care, Texas became the children's home state and thus, Texas had jurisdiction to render a final judgment.[5] *See* Tex. Fam. Code §§ 152.102(7), 152.204(b); *In re J.C.B.*, 209 S.W.3d 821, 824 (Tex. App.—Amarillo 2006, no pet.).

---

custody determination, *see* Tex. Fam. Code § 152.204. I will not draw inferences from the Court's exercise of jurisdiction over this appeal. But to the extent the Court simultaneously concludes that Mother may have interfered with a prior New Mexico custody order, but that Texas had jurisdiction to issue a final order in this matter, I must dissent.

[5] According to Mother, the Department apparently rejected an otherwise suitable placement at the outset of the case because of a "language barrier" between workers for the Department and the placement. Mother testified that this placement was "a licensed childcare provider for the State of New Mexico with a specialty in children with autism" and that she had been the children's "full-time babysitter for the last three years." According to status reports made part of the clerk's record, one of the boys reported to the Department that he felt safe with this person and wanted to live with her. Had the Department placed the children with this individual rather than initially leaving them in a foster home, Texas never would have acquired jurisdiction over this case. *Cf.* Tex. Fam. Code § 152.208(a) (providing that "the court shall decline to exercise its jurisdiction" if party seeking to invoke jurisdiction "has engaged in unjustifiable conduct," unless certain exceptions, such as parties' acquiescing in exercise of jurisdiction, apply).

But just because a court *may* exercise jurisdiction does not mean that a court *must* exercise jurisdiction. In cases involving interstate custody issues, courts are permitted to raise the issue of inconvenient forum sua sponte. Tex. Fam. Code § 152.207(a). They need not wait for a party's motion before determining whether Texas is the most convenient forum for determining the fate of a family whose ties to this state are simply a matter of circumstance. *See id.* The Department argues that Mother's move to New Mexico—both her home and the children's home before this case—prevented it from being able to provide her with services. Maybe so, but is that not another indication that Texas was not the appropriate forum for this case? *See id.* § 152.207(b) (court must consider "all relevant factors" when determining whether it is inconvenient forum). Mother testified that she moved to New Mexico because she had "established support" there; Mother could not afford to live elsewhere. *See id.* § 152.207(b)(4) (court must consider "the relative financial circumstances of the parties"). Moreover, all the evidence concerning Frank's father's conduct and Mother's prior involvement with child protection services existed in New Mexico, not Texas. *See id.* § 152.207(b)(6) (court must consider "the nature and location of the evidence required to resolve the pending dispute), (8) (court must consider "the familiarity of the court of each state with the facts and issues in the pending litigation").

Regardless of the concerns I harbor about the convenience of trying this case in Texas, Mother did not raise this issue below or on appeal. Thus, I would not reverse on this basis. *See* Tex. R. App. P. 33.1(a). I write this section solely to underscore that trial courts have options in cases like this one, and they need not move forward undeterred when both the parent and the Department report that the primary parent's return to his or her home state has complicated the Department's obligations to the family. *See* Tex. Fam. Code § 152.207.

16

## IV.     CONCLUSION

In my view, the Court has impermissibly shifted the burden of proof from the Department and onto Mother. Parents are not merely the sum of their worst days, and our sufficiency review recognizes this. *See In re A.J.D.-J.*, 667 S.W.3d 813, 829 (Tex. App.— Houston [1st Dist.] 2023, no pet.). Rather than forever sever the ties between a Mother that loves her children and children that love their Mother, I would stitch those ties back together. Thus, I respectfully dissent in part.

_____
Maggie Ellis, Justice

Before Chief Justice Byrne, Justices Crump and Ellis

Filed: March 27, 2026